**STATE of Tennessee, Appellee,**

v.

**James Cecil BAXTER, Appellant.**

Court of Criminal Appeals of Tennessee, at Jackson.

July 26, 1996.

Permission to Appeal Applied Denied by Supreme Court Jan. 27, 1997.

Charles S. Kelly, and Charles S. Kelly, Jr., Dyersburg, for Appellant.

Charles W. Burson, Attorney General and Reporter, Ellen H. Pollack, Asst. Attorney General, Nashville, Thomas A. Thomas, District Attorney General, James T. Cannon and

Heard Critchlow, Asst. District Attorneys General, Union City, for Appellee.

## OPINION

BARKER, Judge.

The appellant, James Cecil Baxter, was convicted of the second degree murder of Clyde R. Nichols. As a Range I standard offender, the appellant was sentenced to twenty-five years in the Department of Correction. On appeal, he raises six issues: (a) that the evidence was insufficient to support the jury's verdict; (b) that the trial court erred in failing to grant a judgment of acquittal; (c) that the trial court erred in ruling that the State could impeach the appellant with a prior conviction for incest; (d) that the trial court erred in giving a "coercive" instruction to the jury during its deliberation; (e) that the trial court erred in allowing a State witness to testify that his autopsy report was separate from a toxicology report; and (f) that the trial court erred in imposing an excessive sentence.

We conclude that there is no reversible error in the record. The judgment of the trial court is affirmed.

Just after twelve o'clock noon on December 28, 1994, Deputy Sheriff Jerry Vastbinder responded to a call at the J.W. Cole residence in Obion County, Tennessee. When he arrived, paramedics were attending to the victim, Clyde R. Nichols, who was lying in a "pool of blood." Vastbinder found "traces of blood" on a concrete patio approximately thirty yards from the victim. Vastbinder also found a four inch, lock blade knife on the opposite side of the house. The appellant, who was still at the scene, acknowledged that he used the knife to stab the victim. The appellant said that the victim "came at him with a ten inch sheetrock knife and that he [the appellant] pulled his knife and stabbed [the victim]." The appellant said that "at that point ... he didn't remember anything..., [and] that he just lost his cool." Vastbinder testified that he did not find a knife or weapon on or near the victim.[1]

The appellant was arrested and interviewed later in the day. He told officers that he and the victim had been partners in a contracting business for about ten years. They recently had been feuding. The appellant told officers that on the previous day, December 27, he swung a hammer at the victim during an argument. On December 28, the victim and Sammy Driver arrived at the Cole residence to retrieve the victim's tools. An argument ensued between the appellant and the victim. The appellant reiterated that the victim threatened him with a ten inch sheetrock knife. The appellant stabbed the victim, washed the blood from the knife, and gave the knife to Johnny Whitlow, a co-worker.

Sammy Driver testified that he accompanied the victim, his brother-in-law, to the Cole residence to help the victim retrieve his tools from the appellant. When they arrived, the appellant and Johnny Whitlow were working inside the home. According to Driver, the appellant and the victim argued about the tools and engaged in "a bunch of shouting and cussing." At one point, the victim and Driver gathered some tools and took them to Driver's truck. Thereafter, the victim went back inside the house and argued with the appellant over a shop vacuum. The victim said: "Well[,] if you feel that way about it, just come on out here in the road and fight like a man."

The appellant followed the victim out of the house, pulled a knife from his left pocket, and stabbed the victim in the stomach. Driver tried to grab the appellant's arm, and he and Whitlow restrained the appellant long enough for the victim to break away. The victim ran about thirty yards before falling face forward. The appellant chased the victim, rolled him over, and "with both hands ... rammed the knife into [the victim's] chest." Driver testified that the victim never tried to hit the appellant. At one point, the victim had picked up a hammer inside the house but set it down. Driver had carried several tools to his truck, including a mud pan, a six inch taping knife, and a ten inch taping or sheetrock knife. He testified that

1. According to Vastbinder, two pieces of jewelry and a billfold were found on the victim.

he did not see the victim in possession of a knife or any other weapon.

Dr. O'Brien Cleary Smith, Assistant Medical Examiner for Shelby County and Deputy Chief Medical Examiner for West Tennessee, performed an autopsy on the victim on December 29, 1994. Smith determined that the victim died from "multiple stab wounds." He testified:

> The most significant stab wounds were in the left upper chest and the right upper quadrant of the abdomen.... The wounds to the ... left upper chest went through his left lung and into the heart. Although there was a single large defect in his skin, or wound in his skin, there were separate wound paths through the heart and three separate injuries to the lung in this upper chest wound.
>
> The wound in his right upper quadrant of his abdomen went into the liver, and there were a total of two wounds there.

Smith also testified that the victim had incise wounds, cuts, and abrasions to his fingers, hands, and forearms; he called these injuries "defensive wounds."

Smith testified that the victim's blood and urine samples were sent to the University of Tennessee Toxicology Laboratory. An analysis revealed 1.6 micrograms per milliliters of methamphetamine in the victim's blood. Smith testified that the quantity of methamphetamine, a controlled substance, was "above therapeutic level" but unrelated to the cause of death. Smith acknowledged that methamphetamine is a potential drug of abuse that can cause restlessness, confusion, anxiety, hostility, and similar side effects. However, Smith had concerns with the lab's findings. First, the lab did not distinguish "D" methamphetamine, which is a tightly controlled, potent form of the drug, from "L" methamphetamine, which is commonly found in nasal spray. Second, the lab did not follow procedures to safeguard against false positive readings. As a result, Smith concluded that the effect of the methamphetamine on the victim's behavior, if any, could not be determined.

Johnny Whitlow testified on behalf of the appellant. He was working inside the house with the appellant when the victim and Driver arrived. The victim called the appellant "vulgar names" and also said "I ought to show you what a damn hammer can do to a man." The victim picked up a hammer but set it down. He and the appellant continued to "cuss at one another." The victim told the appellant "to come out and fight" but the appellant refused. The victim took some tools to Driver's truck and then returned to the house acting "like he was fixing to hit [the appellant]." Whitlow then heard Driver yell something about a knife. After the appellant stabbed the victim in the stomach, Whitlow tried to pull the appellant off the victim. The victim ran across the yard. The appellant broke loose, chased the victim, and "buried a knife into [the victim's] chest...."

Whitlow testified that he never saw the victim strike the appellant, though he appeared poised to do so. Whitlow did not see a knife or a weapon in the victim's possession. After the stabbing, the appellant said he "couldn't believe what he did," and he handed the knife to Whitlow. Whitlow conceded that he testified at the preliminary hearing he saw the victim throw a punch at the appellant. Whitlow also acknowledged that he had previously testified he "wasn't capable of seeing" the incident and that the victim "could have had something in his left hand." On redirect examination, Whitlow reiterated that he never saw the victim with a knife.

Dr. Kris Sperry, Deputy Chief Medical Examiner for Fulton County, Georgia, also testified on behalf of the appellant. Sperry reviewed the autopsy and toxicology reports regarding the victim. He testified that methamphetamine has a very high abuse potential and is tightly controlled. Although there are some limited medical uses, high levels of methamphetamine may cause irritability, rage, anger, or hostility. Sperry said that the level of methamphetamine found in the victim's system was "three times the high side of the abuser level."

In rebuttal, Dr. Halbert Dodd, Medical Examiner for Obion County, testified that he, like Dr. Smith, had concerns with the accuracy of the University of Tennessee laboratory's findings as to the level of methamphet-

amine. He questioned the lab's equipment, its failure to implement quality controls to ensure against false positive readings, and its failure to distinguish between "D" and "L" methamphetamine.

## I

When the sufficiency of the evidence is challenged, the standard for review by an appellate court is whether, after considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979); *State v. Duncan,* 698 S.W.2d 63, 67 (Tenn. 1985); Tenn.R.App.P. 13(e). On appeal, the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom. *State v. Cabbage,* 571 S.W.2d 832, 836 (Tenn.1978). In determining the sufficiency of the evidence, this court does not reweigh the evidence, *id.,* and this court does not substitute its inferences for those drawn by the trier of fact. *Liakas v. State,* 199 Tenn. 298, 286 S.W.2d 856, 859 (1956).

Second degree murder is "a knowing killing of another." Tenn.Code Ann. § 39–13–210(a)(1). A person "acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn.Code Ann. § 39–11–302(b). The evidence overwhelmingly establishes a knowing killing in this case. The appellant and the victim engaged in a heated dispute. The victim, who both eyewitnesses said was unarmed, challenged the appellant to fight. The appellant produced a knife and stabbed the victim in the stomach. When the victim fled, the appellant broke free from Driver and Whitlow, chased the victim, rolled

him over, and forcefully stabbed him in the chest by holding the knife with both hands.

The appellant's main contention is that the offense amounted to voluntary manslaughter, that is, "an intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn.Code Ann. § 39–13–211(a). The jury was charged on this offense, but convicted the appellant of second degree murder. As we have described, the evidence was sufficient for a rational trier of fact to have found the elements of the offense beyond a reasonable doubt.[2]

In a related issue, the appellant argues that the evidence preponderates against and is inconsistent with the verdict. In overruling the motion for a new trial, however, the trial court said: "I have reviewed the evidence. I am satisfied that the verdict is supported by the evidence. Therefore I would overrule all grounds alleging the evidence to be insufficient. In addition, as the thirteenth juror, I pass upon the evidence and find that the verdict is supported by the evidence." The trial court properly discharged its function in this regard. *See State v. Moats,* 906 S.W.2d 431, 434 (Tenn. 1995); *State v. Carter,* 896 S.W.2d 119, 122 (Tenn.1995). In sum, the appellant is not entitled to relief.

## II

The appellant next argues that the trial court erred in denying his motion for a judgment of acquittal at the end of the State's proof and at the end of all the proof. He claims, once more, that the State failed to prove the elements of second degree murder and that the evidence supported only a verdict of voluntary manslaughter. The State maintains that the trial court's rulings were correct. We agree.

In *State v. Anderson,* 880 S.W.2d 720, 726 (Tenn.Crim.App.1994), our court discussed judgments of acquittal pursuant to Tennessee Rule of Criminal Procedure 29:

---

2. The appellant also contends that the evidence failed to show "malice," "design," or "intent to kill." As noted above, second degree murder requires proof of a knowing killing. Thus, the appellant's contention is obviously without merit.

The rule empowers the trial judge to direct a judgment of acquittal when the evidence is insufficient to warrant a conviction either at the time the state rests or at the conclusion of all the evidence. At the point the motion is made, the trial court must favor the state with the strongest legitimate view of the evidence, including all reasonable inferences, and discard any countervailing evidence.

*See also State v. Cabbage,* 571 S.W.2d at 836. As we outlined in the preceding issue, the State produced sufficient evidence for the jury to have found the key element of second degree murder, i.e., a knowing killing of another. Thus, the trial court did not err in overruling the appellant's motions.[3]

### III

Prior to trial, the State provided notice of its intent to impeach the appellant with a 1989 felony conviction for incest. The appellant filed a motion in limine to preclude the State from using the conviction; he argued that the offense was not probative of credibility and that it was unfairly prejudicial. The trial court overruled the motion after finding "that the probative value on ... credibility outweigh[ed] the unfair or prejudicial effect on the substantive issues." The appellant did not testify. On appeal, he maintains that the ruling was reversible error. The State, of course, maintains that the ruling was correct.

■ Using a conviction to impeach the accused in a criminal prosecution is governed by Rule 609(a)(3), Tennessee Rules of Evidence:

If the witness to be impeached is the accused in a criminal prosecution, the State must give the accused reasonable written notice of the impeaching conviction before trial, and the court upon request must determine that the conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues. The court may rule on the admissibility of such proof prior to the trial but in any

event shall rule prior to the testimony of the accused. If the court makes a final determination that such proof is admissible for impeachment purposes, the accused need not actually testify at the trial to later challenge the propriety of the determination.

In determining whether the probative value outweighs the unfair prejudicial effect, a trial court should (a) "assess the similarity between the crime on trial and the crime underlying the impeaching conviction" and (b) "analyze the relevance the impeaching conviction has to the issue of credibility." N. Cohen, D. Paine, & S. Sheppeard, *Tennessee Law of Evidence,* § 609.9 at 376 (3d ed.1995); *see also State v. Farmer,* 841 S.W.2d 837, 839 (Tenn.Crim.App.1992).

■ The difficult question in this case is the relevance or probative value of an incest conviction to the issue of credibility. In *State v. Barnard,* 899 S.W.2d 617, 622 (Tenn. Crim.App.1994), our court construed Rule 609(a)(3) and observed that the probative value of a prior sexual battery conviction on the issue of credibility was "slight." *See also State v. Steven O. Ford,* No. 01C01–9403– CC–00089, 1995 WL 544004 (Tenn.Crim. App., Nashville, Sept. 14, 1995) (aggravated sexual battery). Similarly, specific instances of sexual conduct have been held not to be probative of a witness's truthfulness or untruthfulness under the similarly worded provisions of Rule 608. *See State v. Ford,* 861 S.W.2d 846, 849 (Tenn.Crim.App.1992); *State v. Jackson,* 697 S.W.2d 366, 371 (Tenn.Crim. App.1985); *Shockley v. State,* 585 S.W.2d 645, 653 (Tenn.Crim.App.1978); *State v. Buford E. Gaiter,* No. 01C01–9407–CC–00245, 1996 WL 125903 (Tenn.Crim.App., Nashville, March 22, 1996); *see also Tennessee Law of Evidence,* § 608.6 at 354–55.

■ Absent specific factual findings to support its findings, we disagree with the trial court's broadly stated conclusion that the incest conviction was probative of credibility. Nonetheless, we conclude that the appellant has failed to show that he was

---

**3.** We also note that the motion for a judgment of acquittal made at the end of the State's proof was, in effect, waived when the appellant elected to put forward evidence on his own behalf. *See*

*Mathis v. State,* 590 S.W.2d 449, 453 (Tenn. 1979); *State v. Thompson,* 549 S.W.2d 943, 945 (Tenn.1977).

prejudiced by the ruling. Tenn.R.App.P. 36(b). First, the appellant did not make an offer of proof to preserve the issue for appeal. *See Tennessee Law of Evidence,* § 609.9 at 377. Without an offer of proof as to the appellant's testimony, we are unable to assess the impact of the trial court's ruling. *Id.; see also State v. Martin,* 642 S.W.2d 720, 724 (Tenn.1982) (offer of proof needed for appellate court to assess the impact of a ruling).

Moreover, we note that the crux of the appellant's defense—that he acted in response to the victim's aggressive conduct—was elicited from the investigating detective. Vastbinder testified that the appellant told him that the victim had attacked him with a ten inch sheetrock knife, and that the appellant essentially had acted in self defense. Vastbinder also testified that the appellant reiterated his self defense claim when he made a second statement following his arrest. The jury had to assess the appellant's statements in light of the remaining evidence of guilt. Neither eyewitnesses saw the victim in possession of a knife. The appellant stabbed the victim in the abdomen, pursued the victim for approximately thirty yards, rolled him onto his back, and stabbed him forcefully in the chest. The appellant washed the blood from the knife and gave it to Whitlow to discard. After considering all of the evidence, the jury rejected the appellant's defense and convicted the appellant of second degree murder.

For the foregoing reasons, we conclude that the appellant has not shown that he was prejudiced by the trial court's ruling. *See State v. Jerry Lee Finch,* No. 02C01–9309–CC–00224, 1995 WL 334350 (Tenn.Crim. App., Jackson, June 7, 1995), *perm. to appeal denied,* (Tenn.1995); *State v. Harry Garvin, Jr.,* No. 02C01–9308–CC–00193, 1994 WL 560782 (Tenn.Crim.App., Jackson, Oct. 12, 1994). Accordingly, he is not entitled to relief on this ground.

## IV

The appellant argues that the trial court gave a "coercive" instruction to the jury during its deliberation. The record reflects that the jury began deliberating at 11:10 a.m., recessed for lunch at 12:00 p.m., and resumed deliberating at 1:22 p.m. At 3:15 p.m., the trial judge noted that "there has been some difficulty in the jury reaching a verdict." The jury had apparently informed the court that it could not "agree on any of the three choices given." The court brought the jury into open court and said:

You've actually deliberated a relatively short period of time. That's less than three hours. I'm not—don't know how long I'm going to have you deliberate. It could go to tomorrow. At any event, I'm going to have you continue to deliberate. I'd ask that—this is an important case. A lot of time and effort has been put into the case. I would hope that you would continue and attempt to come to a verdict. In any event, I'm going to discharge you to continue to deliberate.

At 3:38 p.m., the jury returned with a verdict of guilty as to second degree murder.

Citing *Kersey v. State,* 525 S.W.2d 139 (Tenn.1975), the appellant argues that the trial court's instruction coerced the jury into returning the verdict. In *Kersey,* our supreme court held that a so-called *Allen* charge, or "dynamite" charge, would no longer be read to deadlocked juries in Tennessee. The *Allen* charge was taken from *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896):

[T]hat although the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows, yet they should examine the question submitted with candor and with a proper regard and deference to the opinions of each other; that it was their duty to decide the case if they could conscientiously do so; that they should listen, with a disposition to be convinced, to each other's arguments; that, if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself. If, upon the other hand, the majority was for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a

judgment which was not concurred in by the majority. . . .

*Id.* at 501, 17 S.Ct. at 157. As noted in *Kersey,* the supreme court had adopted a version of the *Allen* charge in *Simmons v. State,* 198 Tenn. 587, 281 S.W.2d 487 (1955). After considering a number of cases rejecting such a charge, the supreme court followed suit:

> In our view the *Allen* charge and the *Allen–Simmons* charge operate to embarrass, impair and violate the constitutional right of trial by jury. Any undue intrusion by the trial judge into this exclusive province of the jury is an error of the first magnitude. . . . [W]hen the effort to secure a verdict reaches the point that a single juror may be coerced into surrendering view conscientiously entertained, the jury's province is invaded and the requirement of unanimity is diluted. We view these charges as being tantamount to a judicially mandated jury verdict which is impermissible under Tennessee law.

*Kersey,* 525 S.W.2d at 144. To eliminate the risk of coercing the minority to yield to the majority, the court formulated the following instruction, which derived from the A.B.A. standards relating to Trial by Jury, Sec. 5.4:

> The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous.
>
> It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine you own view and change your opinion if convinced it is erroneous. But do not surrender you honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

*Kersey,* 525 S.W.2d at 144–45. The court also noted that "[s]trict adherence is expected and variations will not be permissible." *Id.* At 145.[4]

■■ Here, the court, in effect, ordered the jury to continue deliberating. It did not direct any of its comments to jurors in the minority, nor did it urge such jurors to reevaluate or to cede his or her views to those of the majority. Similarly, the court did not impose a deadline on the jury for its deliberation. We believe that the case is similar to *State v. Dick,* 872 S.W.2d 938, 946 (Tenn. Crim.App.1993), in which the trial court made the following remarks after the jury announced it was unable to reach a verdict:

> Well, you haven't been out that long really. We don't need to know how you're individually split, guilty or innocent, but if you're still discussing the case, and you need to discuss it, and if you reach a point that you just absolutely know that you're not going to be able to do anything, that's when you need to let us know. You need to get to that point, or to the point where you've reached a verdict, then you need to come back, either way. But, it's only 4 o'clock, and we've got a couple or three good hours here that we can work on this, and have plenty of time today. So you all take your time and go through it and discuss it, look at the charge we have given you and work with it, because that's what you're supposed to do. You're supposed to discuss it, take votes and that type of thing. If you will all do that. . . .

As in *Dick,* we do not view the trial court's comments as requiring a reversal of the conviction. The remarks were not an "undue intrusion . . . into this exclusive province of the jury. . . ." *Kersey,* 525 S.W.2d at 144; *see also State v. Goad,* 707 S.W.2d 846, 851 (Tenn.1986); *Bass v. Barksdale,* 671 S.W.2d 476 (Tenn.App.1984) (adopting *Kersey* and noting that "nothing should be done or said to a juror which can in any manner be taken by that juror to indicate that he or she should abandon an honestly held conviction

---

4. The court said that the instruction should be part of the main charge and then repeated in the event of a deadlocked jury. *Id.* at 145.

in order to reach a verdict....").[5] Therefore, the appellant is not entitled to relief on this ground.

## V

The appellant argues that the trial court erred in allowing the State to introduce the medical examiner's autopsy report on direct examination without also introducing the toxicology report. The appellant claims that he was prejudiced in that the trial court's ruling allowed the witness to "distance" himself from the laboratory's findings with regard to the levels of amphetamine and methamphetamine in the victim's blood. The appellant concedes that the toxicology report was introduced during cross examination of the medical examiner.

██ The decision as to whether to admit evidence in a trial is left to the discretion of the trial court. *State v. Hutchison*, 898 S.W.2d 161, 172 (Tenn.1994), *cert. denied,* — U.S. —, 116 S.Ct. 137, 133 L.Ed.2d 84 (1995); *State v. Baker*, 785 S.W.2d 132, 134 (Tenn.Crim.App.1989). The appellant theorized that the high level of methamphetamine in the victim's system contributed to his irrational and hostile behavior toward the appellant. He concedes that he introduced the toxicology report during cross examination of the medical examiner and that he fully questioned the witness about the findings therein. Moreover, the appellant presented his own expert witness who fully discussed the toxicology report as well as the potential effects of the high levels of methamphetamine. Thus, the appellant simply has not shown that he was harmed by the trial court's ruling or the manner in which the evidence was presented. Tenn.R.App.P. 36(b).

## VI

██ Finally, the appellant argues that the trial court imposed an excessive sentence. When a defendant challenges the length, range or manner of service of a sentence, the reviewing court must conduct a *de novo* review on the record with a presumption that the determinations made by the trial court were correct. Tenn.Code Ann. § 40–35–401(d). The presumption of correctness is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn.1991).

The sentence to be imposed by the trial court is presumptively the minimum within the applicable range unless there are enhancement factors present. Tenn.Code Ann. § 40–35–210(c). Procedurally, the trial court is to increase the sentence within the range based upon the existence of enhancement factors and then reduce the sentence as appropriate for any mitigating factors. Tenn. Code Ann. § 40–35–210(d) & (e). The weight to be afforded each factor is left to the trial court's discretion so long as it complies with the purposes and principles of the sentencing act, and its findings are adequately supported by the record. Tenn.Code Ann. § 40–35–210 (sentencing commission comments); *see State v. Shelton*, 854 S.W.2d 116, 123 (Tenn.Crim.App.1992).

██ The record indicates that the trial court reviewed the evidence, the presentence report, and the principles of the sentencing act. The court's findings, therefore, warrant the presumption of correctness. The trial court enhanced the sentence based on the appellant's previous history of criminal convictions or criminal behavior and the appellant's use of a deadly weapon. Tenn. Code Ann. § 40–35–114(1) & (9). The appellant does not contest factor –114(1), which was predicated on the appellant's prior conviction for incest. Instead, the appellant incorrectly argues that factor –114(9), the use of a deadly weapon, was an element in the crime of second degree murder. *See State v. Raines*, 882 S.W.2d 376, 385 (Tenn.Crim.App. 1994) (use of a firearm not an element of second degree murder); *State v. Jerry Cook,*

---

5. We also note that the trial court, out of the jury's presence, said that the division in the jury "may be eleven to one...." Although it is not clear from the record how the court discerned the information, we stress that inquiry into the jury's numerical division "is not proper practice." *Kersey*, 525 S.W.2d at 141. We do not believe that this comment alone in any way alters our conclusions with respect to this issue.

No. 117, 1989 WL 91604 (Tenn.Crim.App., Knoxville, Aug. 16, 1989) (use of knife enhanced sentence for second degree murder). We also reject the appellant's assertion that the deadly weapon enhancement factor is unconstitutionally vague. A statute is unconstitutionally vague only if its prohibitions are not clearly defined and are susceptible to different interpretations as to what conduct is actually proscribed. *See Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972).

The appellant also contends that the trial court failed to consider certain mitigating factors: that he acted under strong provocation; that substantial grounds existed tending to excuse or justify his conduct; that he assisted authorities in locating or recovering any property or person involved in the crime; and that he committed the offense under such unusual circumstances that it was unlikely that a sustained intent to violate the law motivated his conduct. *See* Tenn.Code Ann. § 40–35–113(2), (3), (10), & (11). The appellant's arguments in support of factors (2), (3), and (11) are similar: that the altercation was initiated and provoked by the victim. The trial court rejected these factors, however, after considering that it was the appellant who escalated the conflict by producing a knife. Moreover, the victim fled after the initial altercation but was caught from behind and stabbed in the chest by the appellant. The appellant's argument in support of factor (10) is that he remained at the scene until the authorities arrived. The trial court, however, weighed this evidence against the fact that the appellant washed the blood off the knife and discarded the weapon. In sum, the record reflects that the trial court considered the appellant's arguments and the evidence. The appellant has not overcome the presumption of correctness attendant to the court's findings, and he is not entitled to relief on this ground.

The judgment is affirmed.

JONES, P.J., and WADE, J., concur.