IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 25, 2006

**STATE OF TENNESSEE v. LEE TURNER**

**Direct Appeal from the Circuit Court for Marion County**
**No. 7139    Thomas W. Graham, Judge**

_____

**No. M2005-02749-CCA-R3-CD - Filed March 16, 2007**

_____

The State charged the appellant, Lee Turner, with misdemeanor assault, and a Marion County Circuit Court jury convicted him of that offense. After a sentencing hearing, the trial court sentenced the appellant to eleven months, twenty-nine days to be served at seventy-five percent. On appeal, the appellant contends (1) that the trial court erred by giving the jury an improper "dynamite" or Allen charge after the jury announced it was deadlocked; (2) that the trial court erred by refusing to admit the victim's prior juvenile conviction into evidence for impeachment purposes; and (3) that the trial court relied on unsubstantiated facts in determining the appellant's sentence. Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which DAVID H. WELLES, J., joined. J.C. MCLIN, J., filed a dissenting opinion.

Philip Condra and Charles Douglas Curtis, II, Jasper, Tennessee, for the appellant, Lee Turner.

Paul G. Summers, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; J. Michael Taylor, District Attorney General; and Julia Oliver Sanders, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

Peyton Harris,[1] the victim in this case, testified that in May 2004, he was sixteen years old. One night, the victim and two friends, Eric Anderson and Bobby Rollins, drove to a fitness club in Jasper, Tennessee to work out. Anderson, who was driving, parked beside the appellant's car. The

_____

[1]The victim's first name is spelled "Payton" in the trial transcript. However, for the purposes of this opinion, we will use the spelling that appears in the appellant's indictment, "Peyton."

victim said that when they got out of Anderson's car, they noticed that the appellant was sitting in his car and was eating a sandwich. The boys said hello to him and went into the club. When they came out of the club and started to get back into Anderson's car, the appellant asked them if they wanted to buy a pornographic DVD for ten dollars. The appellant opened the trunk of his car and showed the DVD to them, and the boys told him that they did not want to buy it. The appellant kept asking them to buy it, and the victim asked the appellant if he was a child molester. The appellant said, "I've got something for people like you" and pulled a green and white metal baseball bat out of the trunk. The appellant shook the bat at the boys, and the boys left.

The victim testified that about two days later, his mother dropped him off at the fitness club to work out. The victim saw someone playing basketball outside, thought the person was a friend, and walked toward the basketball court. As the victim approached the court, he realized that the person playing ball was the appellant, and the victim turned back toward the club. The appellant saw the victim and said, "I'd never let people talk to me like that before and I think you owe me an apology." The appellant threatened to kill the victim and stated, "I ain't afraid to go to prison." The victim told the appellant, "I'm a minor you can't hit me." The appellant replied, "Well, there's a big difference in hitting and killing. . . . I'll kill you." The victim saw acquaintance Adam Colston sitting in his car nearby and walked to Colston's car. The victim told Colston, "This man over here is threatening to kill me." Colston drove away, and the victim turned around. The victim testified that as soon as he turned around, the appellant hit him on the forehead with the green and white bat, knocking him down. The appellant walked toward the appellant's car, and the victim went inside the club and told two people that the appellant had hit him. He then telephoned his mother, and she picked him up at the club. The victim said that he had a knot on his head for one day and that his head was sore for about three days. After the incident, the victim had headaches but did not go to a doctor. He acknowledged that after the incident, the appellant filed a juvenile petition against him, charging him with harassment and attempted robbery.

On cross-examination, the victim testified that he is five feet, seven inches tall and weighs one hundred fifty-two pounds. He said that as a result of the petition, he had to appear in juvenile court and that the juvenile court ordered him to stay away from the appellant. He stated that on the night of the assault, his mother filed a complaint at the police department. He denied that the first time he and his friends saw the appellant, they approached the appellant's car and asked the appellant what he was doing. He said that he and his friends did not ask the appellant for money or tell the appellant that they were going to take money from him. The victim denied that on the night of the assault, he asked the appellant if he wanted to buy some marijuana and denied that he told the appellant a second time that the appellant was a child molester. The victim testified that after the appellant hit him with the bat, his head did not bleed and he was not unconscious. He said that after his mother drove him home, she examined his head but did not take photographs. Later that night, the victim and his parents went to the police department and filed a report.

Seventeen-year-old Eric Anderson testified that he was with the victim during the victim's first encounter with the appellant. He said that the appellant tried to sell them a pornographic DVD and that the victim asked the appellant if he was a child molester. The appellant got the bat out of

the trunk, showed it to them, and put the bat back into the trunk. He said that the appellant did not seem to take the victim's child molester comment seriously and that the boys were not afraid when the appellant grabbed the bat. Bobby Rollins testified that he was also present when the appellant asked them if they wanted to buy the DVD. He said that when the victim asked the appellant if he was a child molester, the appellant got the bat out of the trunk "for just a second and then put it back." He said that he did not perceive any danger from the appellant and that he did not take the incident seriously.

Eighteen-year-old Adam Colston testified that he was one year ahead of the victim in school and that they were acquaintances but not friends. On the night of the victim's second encounter with the appellant, Colston had driven to the fitness club and was sitting outside in his car. Colston saw the appellant playing basketball on the basketball court and saw the victim walk out of the fitness club and toward the basketball court. The victim then turned around and walked toward Colston's car. Colston also saw the appellant walking toward Colston's car. The victim walked up to Colston, spoke with Colston briefly, and turned around and walked toward the appellant. Colston heard the appellant say to the victim, "I don't want to hit you[.] I want to kill you." Colston did not want to get involved and drove away. He said that he did not see anything in the appellant's hands but that he could only see the appellant's left hand and that it was possible the appellant was holding something in his right hand. On cross-examination, Colston testified that he did not see the appellant hit the victim.

Sandra Harris, the victim's mother, testified that on the night of the assault, the victim telephoned her from the fitness club and told her that she needed to pick him up. When she arrived at the club, the victim was nervous and upset. She looked at the victim's head, and he had "a long knot that went down the straight of his head." The victim told her what had happened and complained of a headache, and Harris checked his pupils and watched him for symptoms of a concussion. Later that night, she filed a police report. She did not know the appellant's name at that time, but sometime later, she saw the appellant at the fitness club and telephoned the police. The police arrived at the club, and the appellant admitted to them that he had a baseball bat in his car. The appellant filed a juvenile petition against the victim, and the victim appeared in juvenile court. The juvenile court found the victim not guilty but ordered that he and the appellant stay away from each other. Sandra Harris said that at the juvenile court hearing, the appellant testified that the victim and his friends tried to rob him and that he hit the victim with the bat. The appellant also testified at the juvenile court proceeding that he spit in the victim's face and told the victim that "you picked the wrong one to mess with." On cross-examination, Sandra Harris testified that she did not take pictures of the victim's head because his hair covered the knot and "[a]ll you could do was feel it." After the assault, the victim had migraine headaches, and he had a CAT scan about one month after the incident.

Robert Harris, the victim's father, testified that when the victim returned from the fitness club on the night of the assault, the victim's head hurt and he told his parents what had happened. The victim's mother felt the victim's head and said the victim had a long knot. Although the victim had a headache, his parents did not think they needed to take him to the hospital. However, they went

to the police department and filed a report. In a juvenile court hearing, the appellant told the court that the victim had tried to assault him and that he hit the victim with the bat, knocking him down. Robert Harris testified that according to the appellant, the victim begged the appellant not to hit him again, and the appellant spit on the victim and told the victim that the victim did not know who he was messing with. Robert Harris stated that the victim had lied to him before but that he believed the victim was telling the truth about the assault. The jury found the appellant guilty of misdemeanor assault.

## II. Analysis

### A. "Dynamite" Charge

The appellant contends that the trial court erred by giving the jury a "dynamite" or Allen charge after the jury informed the trial court that it was deadlocked. The State contends that the trial court did not give the jury an improper instruction. We agree with the State.

The trial transcript reflects that jury retired to the jury room at 3:05 p.m. in order to begin deliberations. At 5:05 p.m., the jury sent a note to the trial court, stating that it was deadlocked. One minute later, the jury returned to the courtroom, and the trial court instructed the jury as follows:

> Ladies and gentlemen of the jury, I understand, I understand that you all are having difficulty reaching a unanimous decision in this case and you've been out for a pretty good while for the amount of time that we had the proof on, so I'm not going to keep you too much longer, but if we accept a hung jury situation obviously what happens is we have to retry the case before another jury and so be it if you all can't agree, but I do want you to listen to the charge, this was in your charge before, but we're allowed to read this back to a jury when they're having difficulty. I want you to listen to this closely, it is important that you all deliberate with an agreement of reaching -- with a mind of reaching a verdict if you can do so. What I am allowed by law to restate to you is this[:]
>
> Ladies and gentlemen, it is your duty as jurors to consult with one another and to deliberate with a view of reaching an agreement if you can do so without violence to your individual judgment. Each of you must decide this case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations you should not hesitate to re-examine your own views and to change your opinion if convinced that it is erroneous. But do not surrender your honest conviction as to the weight or effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

-4-

So go back and take another look at this evidence and what somebody thinks is there or isn't there and see if you can't bridge the gap, if you can't then that's fine. We'll call you back in a little while and if we have to we'll declare a mistrial, that's what happens when a jury can't reach a verdict and the case could be retried again at another time.

Okay, all rise and allow the jury to go back to the jury room.

According to the transcript, the jury returned to the jury room at 5:10 p.m. and returned to the courtroom at 5:25 p.m. to announce a guilty verdict.

The appellant contends that the trial court's instructions "served to confuse and compel the jury into believing it must render a verdict despite the deadlock, as evidenced by the fact the jury returned with a verdict only fifteen minutes after the re-charge." He also contends that the trial court's informing the jury that the case would be retried "constituted reversible error in that it presents an incomplete picture . . . most notably, that the prosecution could choose not to retry the case."

In Kersey v. State, 525 S.W.2d 139 (Tenn. 1975), the jury reported to the trial court during deliberations that it did not appear the jury would be able to reach a verdict. Accordingly, the trial court asked about the division amongst the jurors, and the foreman reported that the jury was hung eleven to one. Id. The trial court then provided a variation of the instruction set forth by the United States Supreme Court in Allen v. United States, 164 U.S. 492, 17 S. Ct. 154 (1896), encouraging each juror to listen to his fellow jurors "'with a disposition to be convinced'" and noting that "'[i]f the larger number are for conviction or acquittal, a dissenting juror should consider whether his doubt was a reasonable one which made no impression on the minds of so many other men, equally honest, and equally intelligent with himself.'" Kersey, 525 S.W.2d at 140. The variation of the Allen charge employed by the court had previously been approved by the Tennessee Supreme Court in Simmons v. State, 281 S.W.2d 487 (Tenn. 1955).

In reviewing the trial court's actions, our supreme court first held that the court's inquiry concerning the division of the jurors was "not a proper practice." Kersey, 525 S.W.2d at 141. The court stated,

Under the inherent and the statutory supervisory power of this Court, we advise the trial bench that when a jury's deli[b]erations have not produced a verdict, and it returns to the courtroom and so reports, the presiding judge should admonish the jury, at the very outset, not to disclose their division or whether they have entertained a prevailing view. The only permissive inquiry is as to progress and the jury may be asked whether it believes it might reach a verdict after further deliberations. If the trial judge feels that further

-5-

deliberations might be productive, he may give supplemental instructions in accordance with subsequent portions of this opinion.

Id.

Second, the court rejected both the Allen charge and the Allen-Simmons variation, holding that the charges "operate to embarrass, impair and violate" the right of trial by jury guaranteed by the Tennessee Constitution. Kersey, 525 S.W.2d at 144. The court explained that

[a]ny undue intrusion by the trial judge into this exclusive province of the jury, is an error of the first magnitude. We recognize that the trial judge has a legitimate concern in the administration of justice and that he labors under a duty to lend guidance to the jury through instructions as to the governing principles of the law. However, when the effort to secure a verdict reaches the point that a single juror may be coerced into surrendering views conscientiously entertained, the jury's province is invaded and the requirement of unanimity is diluted.

Id.

Having concluded that the Allen charge and the Allen-Simmons variation were unconstitutional, our supreme court further exercised its statutory and inherent supervisory power by directing trial courts, when faced with deadlocked juries, to provide the following instruction, which should be included in the "main charge" and repeated if the jury is deadlocked:

The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

Id. at 145; see also Tennessee Pattern Jury Instruction 43.02. Our supreme court emphasized that trial courts should strictly adhere to the language of the instruction and variations would not be permissible. Id.

In State v. Baxter, 938 S.W.2d 697 (Tenn. Crim. App. 1996), a panel of this court considered whether the trial court had given a dynamite charge after the jury, which had been deliberating for about three hours, informed the court that it could not agree on a verdict. In that case, the jurors returned to the courtroom, and the trial court instructed them as follows:

> You've actually deliberated a relatively short period of time. That's less than three hours. I'm not--don't know how long I'm going to have you deliberate. It could go to tomorrow. At any event, I'm going to have you continue to deliberate. I'd ask that--this is an important case. A lot of time and effort has been put into the case. I would hope that you would continue and attempt to come to a verdict. In any event, I'm going to discharge you to continue to deliberate.

Id. at 703. Less than twenty-five minutes later, the jury returned with a guilty verdict. Id. This court concluded that the trial court had not given the jury a dynamite charge, stating,

> Here, the court, in effect, ordered the jury to continue deliberating. It did not direct any of its comments to jurors in the minority, nor did it urge such jurors to reevaluate or to cede his or her views to those of the majority. Similarly, the court did not impose a deadline on the jury for its deliberation.

Id. at 704.

Turning to the instant case, we do not believe the trial court's comments require a reversal of the appellant's conviction. Like the trial court in Baxter, the trial court in this case asked the jury to continue deliberating, did not direct its comments to jurors in the minority, and did not urge jurors to acquiesce to the views of the majority. The trial court also repeated the proper Kersey instruction, which was in the main charge.

While the better practice would have been for the trial court not to make any comment regarding a possible retrial of the case, the trial court did not mention anything about the time, effort, or expense of a retrial. Compare Johnson v. Hardin, 926 S.W.2d 236, 234 (Tenn. 1996) (concluding that the trial court's remarks about the time, effort, and money for a retrial were coercive and violated Kersey). The trial court also told the jury that "if we have to we'll declare a mistrial" and "so be it if you can't agree," demonstrating that the trial court was not trying to compel the jury to give a verdict. We conclude that the appellant is not entitled to relief.

### B. Prior Juvenile Conviction

Next, the appellant contends that the trial court erred by refusing to allow him to question the victim's mother about the victim's prior juvenile adjudication for joyriding. He argues that joyriding is a crime of dishonesty and that evidence about the juvenile "conviction" was admissible for impeachment purposes. Moreover, he contends that the victim's mother opened the door to the questioning. The State claims that the trial court properly refused to allow the defense to question the victim's mother about the victim's prior conviction. We agree with the State.

During Sandra Harris' cross-examination testimony, the defense asked her, "Now, [Peyton]'s a pretty good boy, isn't he?" and Harris answered, "Yes. He is." The defense then stated, "We'll see what the juvenile court says about that. []Violation of youth, access to tobacco act." The State objected, and the trial court sent the jury out of the courtroom. The defense informed the trial court that the victim had a prior joyriding conviction, that it was relevant to the victim's truth and veracity, and that the victim's mother had opened the door to questioning about the conviction. The victim's mother told the trial court that when the victim was thirteen or fourteen years old, a friend of the victim took a family member's car without permission. The friend drove to the victim's home and asked the victim to ride around with him. She stated that the victim appeared in juvenile court and was sentenced to community service. The trial court ruled that "that's just not really a theft situation" and that the defense could not question Sandra Harris about it.

Tennessee Rule of Evidence 609(a)(2) provides that the credibility of a witness may be attacked by evidence of a prior conviction if the prior conviction was a felony conviction or involved dishonesty or a false statement. However, "[e]vidence of juvenile adjudications is generally not admissible" to impeach the accused in a criminal case. Tenn. R. Evid. 609(d). Nevertheless, a trial court "may . . . allow evidence of a juvenile adjudication of a witness other than the accused in a criminal case if conviction of the offense would be admissible to attack the credibility of an adult and the court is satisfied that admission in evidence is necessary for a fair determination in a . . . criminal proceeding." Tenn. R. Evid. 609(d). A Rule 609 ruling will not be reversed on appeal absent an abuse of discretion. State v. Mixon, 983 S.W.2d 661, 675 (Tenn. 1999).

Joyriding is a Class A misdemeanor and is defined, in pertinent part, as the taking of another's vehicle "without the consent of the owner and the person does not have the intent to deprive the owner thereof." Tennessee Code Annotated § 39-14-106. We note that although the trial court concluded that the facts surrounding the victim's juvenile adjudication for joyriding did not involve a theft in the victim's particular case, "the evidence relating to the elements of the crime is to be considered in questioning the offense's relevance to dishonesty, not the general circumstances or environment within which the offense was committed." State v. Walker, 29 S.W.3d 885, 891 (Tenn. Crim. App. 1999). Moreover, a panel of this court has concluded that joyriding is a crime of dishonesty. State v. Larry Leonard Joyner, No. 7, 1991 WL 72004, at *4 (Tenn. Crim. App. at Jackson, May 8, 1991), perm. to app. denied, (Tenn. 1996). Therefore, assuming arguendo that the probative value of the victim's prior juvenile adjudication for joyriding outweighed the danger of unfair prejudice, the victim's prior conviction would have been a proper subject of cross-

examination for impeachment purposes. However, the defense should have questioned the victim, not the victim's mother, about it. See Tenn. R. Evid. 609(a)(1). Although the appellant claims that Sandra Harris opened the door to impeachment, we believe the defense asked the question with the pretense of later arguing that Harris opened the door to cross-examination about her son's juvenile adjudication for joyriding. Therefore, we conclude that the defense could not ask Sandra Harris about the victim's prior conviction and that the appellant is not entitled to relief.

## C. Sentencing

Finally, the appellant claims that the trial court improperly considered the facts in the presentence report, as opposed to the facts presented at trial, when imposing his sentence. He contends that by relying on the inaccurate facts in the report, the trial court violated Tennessee Code Annotated section 40-35-101, which provides that a defendant shall receive a fair sentence "justly deserved in relation to the seriousness of the offense." The appellant also contends that in determining his sentence, the trial court inaccurately stated the facts of the case and failed to consider an applicable mitigating factor. The State argues that the trial court properly sentenced the appellant. Although the State acknowledges that the trial court misstated some facts at the sentencing hearing, the State contends that trial court's "exaggeration of the facts" does not warrant relief. We conclude that the trial court properly sentenced the appellant.

Prior to the sentencing hearing, the appellant filed a motion to strike the appellant's presentence report from the trial court's consideration. In the motion, the appellant argued that the "official version of events" in the presentence report "contains statements at odds with and contradictory to trial testimony." According to the "OFFICIAL VERSION" of facts in the appellant's presentence report, on May 23, 2004, the appellant approached the victim on the basketball court and asked if the victim wanted to buy some pornography. The victim said no, but the appellant persisted, and the victim asked the appellant if he was a child molester. The appellant became very upset, got a green baseball bat out of his car, and assaulted the victim with it. At the sentencing hearing, no witnesses testified, and the trial court overruled the appellant's motion to strike the presentence report.

The appellant's presentence report shows that the then thirty-six-year-old appellant graduated from high school, never married, and had no children. In 1989, the appellant was found guilty of second degree murder and received a twelve-year sentence. According to the report, the appellant had sixteen disciplinary incidents in prison, most of which related to his not cooperating with prison staff. The appellant was never paroled and served his entire sentence in confinement. In the report, the appellant described his physical health as "fair," stating that he suffered from allergies and exercise-related asthma. He also described his mental health as fair and said that he did not take any medications for his mental condition because of side effects. In the report, the appellant stated that he tried marijuana and cocaine when he was a teenager but that he had not used any illegal substances since he was eighteen years old.

In determining the appellant's sentence, the trial court stated that "at trial the testimony was that [the victim] was basically knocked senseless on the ground and was begging for his life, that's what was testified to by the parents." The defense, disagreed, stating "That's not the way I recall the testimony, Your Honor." The defense also argued that the victim instigated the incident with his "smart aleck" comment, but the trial court disagreed, stating that "regardless of how obnoxious somebody is do you think that that means they should be subject to being hit with a ball bat?" The trial court stated that this could have been an aggravated assault case, that the appellant could have killed the victim, and that the appellant's sentence should be eleven months, twenty-nine days. The trial court told the appellant that he would be eligible for release after serving seventy-five percent of his sentence and said, "I'm sentencing him because he is competent and he's previous[ly] done a very similar act and this was a very serious incident where human life was at stake and where he had a previous criminal record."

When an appellant challenges the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). Generally, the presumption of correctness is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). However, the trial court has more flexibility in misdemeanor sentencing than in felony sentencing. State v. Johnson, 15 S.W.3d 515, 518 (Tenn. Crim. App. 1999) (citing State v. Troutman, 979 S.W.2d 271, 273 (Tenn. 1998)). Review of misdemeanor sentencing is de novo with a presumption of correctness even if the trial court failed to make specific findings on the record, because the "trial court need only consider the principles of sentencing and enhancement and mitigating factors in order to comply with the legislative mandates of the misdemeanor sentencing statute." Troutman, 979 S.W.2d at 274.

In sentencing the misdemeanor defendant, the trial court shall fix a percentage of the sentence, not to exceed seventy-five percent, that the defendant must serve in confinement before being eligible for release into rehabilitative programs. Tenn. Code Ann. § 40-35-302(d). In determining the percentage of the sentence to be served in confinement, the trial court shall consider the sentencing principles and enhancement and mitigating factors and "shall not impose such percentages arbitrarily." Id.; see also Troutman, 979 S.W.2d at 274. In conducting our review, this court must consider (1) the evidence, if any, received at trial and at the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to the sentencing alternatives; (4) the nature and characteristics of the offenses; (5) any mitigating or enhancement factors; (6) any statements made by the appellant on his own behalf; and (7) the appellant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Ashby, 823 S.W.2d at 168. The burden is on the appellant to show that the sentence is improper. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments.

We agree with the appellant that some of the facts set forth in the presentence report are inaccurate. For example, the facts have combined the two incidents described at trial into one incident, and no one testified at trial that the appellant approached the victim on the basketball court

-10-

and offered to sell him pornography there. We also agree with the appellant that the trial court misstated some facts. At the sentencing hearing, the trial court stated that the victim's parents testified at trial that the appellant knocked the victim senseless to the ground and that the victim begged for his life. However, neither of the victim's parents gave such testimony. The trial court apparently was referring to Robert Harris' testimony that the appellant stated at the victim's juvenile court hearing that the appellant knocked the victim down and that the victim begged for his life.

Nevertheless, despite the incorrect facts in the presentence report and the trial court's misstatement of the facts, upon our de novo review, we conclude that the trial court properly sentenced the appellant. The evidence at trial revealed that the appellant persistently asked the victim and his friends to buy pornography. When the victim refused to buy the DVD and asked the appellant if he was a child molester, the appellant showed the bat to the victim. A couple of days later, the appellant saw the victim at the fitness club, followed the victim to Adam Colston's car, struck the victim on the head with the bat, and walked away. As the trial court noted, the presentence report reflects that the appellant has a prior conviction for second degree murder. Therefore, enhancement factor (1), that the appellant "has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range," applies to the appellant's sentence. Tenn. Code Ann. § 40-35-114(1). The trial court also noted that the appellant could have killed the victim, and we believe enhancement factor (10), that the appellant "had no hesitation about committing a crime when the risk to human life was high," applies because the appellant hit the victim on the head with the bat with enough force to knock the victim down and result in a long knot on the victim's head. See Tenn. Code Ann. § 40-35-114(10).

The defense argues that the appellant's sentence should be mitigated because the victim called the appellant a child molester, and, therefore, the appellant acted under strong provocation. See Tenn. Code Ann. § 40-35-113(2). First, we agree with the trial court that the minor victim's statement did not justify his being hit on the head with a bat. Moreover, the evidence shows that the victim made the statement to the appellant two days before the assault and that the victim did not initiate any further contact with the appellant. Instead, the appellant followed the victim to Adam Colston's car and hit the victim as soon as the victim turned around. Mitigating factor (2) does not apply in this case. We conclude that a sentence of eleven months, twenty-nine days is appropriate and that the sentence should be served at seventy-five percent.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE