# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### September 11, 2001 Session

## STATE OF TENNESSEE v. TAVARUS WILLIAMS

### Direct Appeal from the Criminal Court for Shelby County
#### No. 91-11920    Bernie Weinman, Judge

### No. W2000-03114-CCA-R3-CD - Filed April 17, 2002

The Defendant was convicted in 1991 of first degree murder and sentenced to life imprisonment. After his conviction was affirmed on direct appeal, the Defendant filed a post-conviction petition, and the trial court denied relief. However, on post-conviction appeal, this Court determined that the Defendant received ineffective assistance of counsel at trial and therefore reversed the trial court's decision, vacated the Defendant's conviction, and remanded the case for a new trial. The Defendant was tried a second time in 2000 before a Shelby County jury, and on this occasion, the jury found the Defendant guilty of second degree murder. The trial court sentenced him to twenty years incarceration. The Defendant now appeals his conviction and sentence, arguing (1) that insufficient evidence was presented at trial to support his conviction, and (2) that he was improperly sentenced. We conclude that sufficient evidence supports the jury's verdict and thus affirm the Defendant's conviction. However, we conclude that the trial court erred in sentencing the Defendant and therefore we remand for re-sentencing in accordance with this opinion.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed in Part, Reversed in Part and Remanded

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL and NORMA MCGEE OGLE, JJ., joined.

C. Anne Tipton, Memphis, Tennessee, for the Appellant, Tavarus Williams.

Paul G. Summers, Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; William L. Gibbons, District Attorney General; Jerry Kitchen, Assistant District Attorney General; and Rosemary Andrews, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

In September 1991, the Defendant shot and killed Raymond Brooks, the victim in this case, outside of a club in Memphis. Although he was fifteen years old at the time of the crime, the Defendant was tried as an adult and convicted of first degree murder, for which he received a

sentence of life imprisonment. This Court affirmed his conviction on direct appeal, see State v. Tavarus U. Williams, No. 02C01-9307-CR-00137, 1994 Tenn. Crim. App. LEXIS 393 (Tenn. Crim. App., Jackson, June 29, 1994), and the Tennessee Supreme Court denied the Defendant's application for permission to appeal. The Defendant subsequently filed a petition for post-conviction relief. After an evidentiary hearing, the trial court denied relief, and the Defendant appealed the trial court's decision. On appeal, this Court held that the Defendant received ineffective assistance of counsel at trial. See Tavarus U. Williams v. State, No. 02C01-9711-CR-00423, 1998 Tenn. Crim. App. LEXIS (Tenn. Crim. App., Jackson, Oct. 23, 1998). This Court therefore reversed the judgment of the lower court, vacated the Defendant's conviction, and remanded the case for a new trial. See id.

In August 2000, the Defendant was again tried for the murder of Raymond Brooks. At the second trial, the jury found the Defendant guilty of second degree murder. Following a sentencing hearing, the trial court sentenced the Defendant to twenty years incarceration. The Defendant now appeals both his conviction and his sentence. Having reviewed the record, we affirm the Defendant's conviction, but reverse the judgment as to the sentence only, and remand to the trial court for a new sentencing hearing.

The following evidence was presented at the Defendant's second trial for the shooting death of victim Raymond Brooks: Captain Frederick Sansom of the Memphis Police Department testified that in 1991, he was called to the scene of a homicide that took place at J.T.'s Lounge, located at 1403 Elvis Presley Boulevard. Sansom stated that he arrived at the scene at 3:36 a.m., where he was advised by other officers already present at the scene that "a male black had been shot dead on the sidewalk in front of the lounge." Officers found a pair of sunglasses near the victim's body and "a brown slip of paper," on which a phone number and the name "Saundra" were written, in the victim's pocket. Officers found no weapons or money on or near the victim's body. As part of his duties, Sansom made a sketch of the scene, which was shown to the jury at trial.

Dr. O.C. Smith, medical examiner for Shelby County, testified that he had reviewed a report containing the results of an autopsy performed on the victim, but stated that he did not actually perform the autopsy. He explained that the previous medical examiner for Shelby County, who had resigned in 1999, performed the autopsy. Smith testified that the victim was a twenty-year-old male who died of multiple gunshot wounds to the head and chest. He specified that the victim sustained six or seven gunshot wounds. Smith testified that after being shot, the victim did not live long; he stated that the victim "could have been rendered unconscious or incapacitated almost immediately."

Dr. Smith reported that "powder burns" were found on the victim's right arm. He explained, "Powder burns are a layman's term to describe wounds that are produced when the muzzle of the weapon is close enough to the skin surface at the time it's fired that it actually marks the skin." Smith stated that the type of "powder burns" found on the victim's arm were in a "stipple pattern," indicating that the weapon used to shoot the victim was likely fired from a distance of twenty-four inches or less from the victim's skin. In addition, Smith reported that a "defensive wound" was found on the back of the victim's right arm which was "consistent with any scenario that you can devise in which the back surface of the arm would be presented to the muzzle of the weapon."

Finally, Dr. Smith reported that at the time of death, the victim had a blood alcohol content of .17 percent. Smith testified that a person with a blood alcohol level of .17 would exhibit impairment in his judgment, his reaction time, his gross motor skills, and his vision. He also testified that a person with such a blood alcohol level would experience "some emotion apathy where the effect of alcohol . . . so affect[s] the brain that the person is not easily excited" or may be "withdrawn." Smith reported that the victim's "drug screen was negative."

Gloria Brooks testified that she was the victim's mother. She stated that she went to J.T.'s Lounge immediately after hearing of her son's death and saw her son lying "right at the door" of the lounge. She testified that at the time of her son's death, he was five feet, six inches tall and weighed 165 pounds. Brooks also testified that her son was right-handed.

David Monger testified that he was at a birthday party at a lounge on Elvis Presley Boulevard on the night of the victim's death. He stated that he walked outside of the lounge in the early morning hours to "get[] a breath of fresh air" and sat down to talk to another male. He testified, "[A]ll of a sudden we heard a gunshot. . . . [W]e looked and turned and saw a fellow . . . shooting the . . . victim down . . . just like he was an animal . . . . And when [the victim] fell, . . . a few more shots were fired." Monger testified that when the victim was shot, he immediately collapsed against a wall with his head down. He recalled that after the victim fell, the shooter "walk[ed] around . . . and kept looking at [the victim] . . . like he was picking a place and shooting him." Monger stated that he could hear the shooter talking and "mumbling" to the victim while he was shooting, saying "I told you I was going to get you." Monger recalled that he next heard "a gun click, . . . like if [the shooter] had any more bullets he would waste them . . . . and then [the shooter] just stopped [,] . . . didn't try to hide the gun, . . . [and] walked across the street like nothing had happened . . . ." Monger stated that he then saw the shooter get into a white car with someone else and leave the scene.

Monger testified that he was sitting approximately fifty to sixty feet away from where the shooting occurred. Monger stated that prior to hearing the gunshots, he did not hear or see anything to indicate that the victim and the shooter were arguing. He testified that he knew neither the shooter nor the victim and had never seen either of them before the night of the shooting. Monger further testified that although other people were outside of the lounge, no one was "around [the victim] at the time" he was shot. Finally, Monger stated that he did not see any type of weapon in the victim's possession.

On cross-examination, Monger testified that the lighting at the scene of the crime was not good enough for him to clearly see the shooter. He admitted that he was shocked and frightened at the time of the crime. Monger also testified that he did not witness what happened before hearing the first gunshots or see the victim's hands prior to hearing the first two shots. He testified that when he turned towards the crime scene, the victim was "standing up against the wall . . . and he was just facing [the shooter] . . . . Then after [the shooter] shot [the victim], that's when [the victim] started moving . . . ."

Patrick Mason testified that he had gone to school with the victim. He reported that at approximately 11:00 p.m. on the night of the crime, he went to J.T.'s Lounge, where he saw the victim and later witnessed the shooting. Mason recalled that he was standing outside of the lounge, approximately five to ten feet from the club, when he heard the first shot. He stated that when he heard gunfire, he ran behind a car for protection and watched the crime take place. Mason reported that the Defendant first fired "[a] close gunshot in the stomach" and immediately afterwards, fired five more shots "to the [victim's] head." He testified that after the first shot, he saw the victim lying down and the Defendant "standing over [the victim] with the gun." Mason recalled that the victim was still alive after the first gunshot and tried to cover his face with his hands to protect himself. He recalled that the entire incident spanned approximately two minutes. Mason testified that he did not hear the Defendant or the victim say anything during the shooting, but he reported that as the Defendant left the scene, he said, "Look at you now." He recalled that the Defendant then walked across the street, got into a car, and drove away. Mason stated that he did not see anything in the victim's hands during the shooting, but he testified that he was able to see the Defendant's gun, which he reported was a .357 caliber handgun. Finally, Mason testified that although he had referred to the shooter as the Defendant in court, he did not know the Defendant and could not recognize the shooter in court or at the time of the crime.

On cross-examination, Mason testified that the Defendant shot the victim from a distance of approximately two feet. He stated that prior to the first shot, the victim's hands were "down" and that after the first shot, the victim raised his hands over his head "like he was begging for his life." Mason also testified that no one was outside of the lounge when the shooting began, but that after the first shot was fired, "everybody all came outside the club." He estimated that "close to 100" people exited the club after hearing the gunshots.

On redirect examination, Mason admitted that he told police immediately after the crime that the Defendant shot the victim from a distance of four to five feet. He also admitted that immediately after the crime, he told police that he "didn't hear nothing," despite his testimony on direct examination that he heard the Defendant speak to the victim after the crime. Mason stated, however, that his testimony as to the details of the crime was based on his best recollection, and he pointed out that the trial took place nine years after the crime was committed.

Wilma Hayden testified that her father, Willie James Hayden, Sr., was a security guard at the time of the crime. She stated that Mr. Hayden died in 1995 of bone cancer, and she reported that her father was taking medication for his illness in 1991. Martha Jackson, a court reporter administrator for the criminal courts of the State of Tennessee, testified next. She testified that at the request of the State, she had retrieved a transcript of Mr. Hayden's testimony on June 30, 1992. The State then entered into evidence a cassette recording and a transcript of Mr. Hayden's testimony containing the following information: Mr. Hayden testified that he was working as a security guard at J.T.'s Lounge on the night of the crime in this case. Hayden testified that he was standing four to five yards or less from the spot where the shooting occurred. He stated that he heard the first shot and turned to see the victim, who had nothing in his hands, collapsing against a wall while being shot. Hayden testified that he then heard several more shots in rapid succession. He stated that he did not

hear any statements during the shooting, but he recalled that after the shooting, he heard a male who was with the shooter say to the shooter, "You done killed the son of a bitch. Let's go." Hayden testified that the shooter, the male who spoke to the shooter, and a third male then left the scene. He reported that the three men ran to a car, and two of them got into the car. Hayden testified, however, that the shooter "passed the pistol" to the passenger in the car and "took off running." Hayden identified the shooter as the Defendant.

The Defendant called several witnesses in his defense. Marcus Jacocks testified that he was the Defendant's cousin. He stated that on the night of the crime, he, the Defendant, and a man named Brian Adams drove to J.T.'s Lounge to perform in a "rap-show concert." He recalled that they arrived at between 10:00 and 11:00 p.m. and that they went on stage at approximately 1:30 a.m. Jacocks testified that after their performance, they "started to mix and mingle around the bar," and the Defendant began talking to a young woman. Jacocks recalled that after the Defendant and the woman conversed for a few minutes, the victim approached them. According to Jacocks, the victim "introduced himself with . . . bad language towards" the Defendant and stated that the woman with whom the Defendant was conversing was "with [him]." The conversation quickly escalated into an argument, with the victim and the Defendant "exchanging words" and using profanity, until Jacocks and a man who was with the victim separated the victim and the Defendant. Jacocks testified that after the argument, he and the Defendant left the area where they had been standing and walked to the other side of the club.

However, according to Jacocks, the victim followed them and again confronted the Defendant. Jacocks stated that the victim began to threaten the Defendant, saying, "I'm going to blow your ass off, man." Jacocks reported that he again separated the two men and told the Defendant, "It's time to go, man. He's talking about killing you." Jacocks testified that he and the Defendant then left the club and began to look for Brian Adams, from whom they had become separated. When they were unable to locate Adams, they waited outside the club.

Jacocks testified that while they waited, the victim and four or five other men approached them "from around the corner of the building[,]" and the victim said, "There those mother f__ckers go right there." Jacocks stated that the victim then asked the Defendant, "What's that sh_t you got to say to me?" Jacocks reported that at this point, "everybody started to walk off because they knew something was fixing to happen." According to Jacocks, the victim began making "death threats" towards the Defendant; Jacocks testified that the victim reached for a gun that was in his friend's possession and said, "Give me this thing so I can kill the bitch." However, Jacocks stated that although the victim "made a motion for a the gun," he did not see the victim actually obtain the gun because immediately after the victim made the statement, the Defendant "pulled his gun out" and began firing. Jacocks recalled that when the Defendant began to fire the gun, everyone who was standing outside "scattered." Jacocks reported that he told the Defendant, "Don't shoot him." He testified that the Defendant fired a total of six shots from his revolver, never saying a word, and he recalled that the Defendant continued trying to fire the gun after all of the bullets were spent. He described the Defendant as being "in a daze" and stated that the Defendant "had just lost it." Jacocks testified that the Defendant then "stepped back," and they left the scene. He reported that he got into

a car with a friend, but stated that the Defendant did not get into the car. Finally, Jacocks denied that the Defendant ever gave him the gun used in the shooting.

On cross-examination, Jacocks admitted that he had been convicted of voluntary manslaughter and of selling cocaine. He also testified that he did not speak to police for four days after the crime. In addition, Jacocks admitted that his testimony had changed since the time of the crime regarding how many men approached the Defendant with the victim immediately prior to the shooting. He stated that although he had previously testified that the victim and two men had approached the Defendant, he testified on direct examination that the victim and four or five men approached the Defendant. However, he maintained that his most recent testimony was correct.

Tony Jefferson testified that he was working as a bouncer at J.T.'s Lounge on the night of the crime. He testified that he did not know the Defendant prior to the night of the crime, but stated that he was friends with the victim. He reported that he helped "break . . . up" the argument that took place between the victim and the Defendant inside J.T.'s Lounge prior to the shooting. Jefferson recalled that after the argument, the Defendant left the area where they had been standing. He testified that he then heard the victim tell another male named Darryl that he was "going to go out there and go slap [the Defendant] like he's a whore." Jefferson maintained that he told the victim to "leave it alone," and the victim promised that he would. However, he stated that the victim ignored his advice and again approached the Defendant. According to Jefferson, Darryl told the victim that Darryl had a gun, and "that's what triggered it all."

Jefferson recalled that the Defendant was standing outside of the club when the victim approached him. He stated that the victim asked Darryl to "pass him" the gun, but "Darryl ran off." Jefferson was unsure whether Darryl left before or after the Defendant began shooting. Jefferson stated that he heard only one shot before reentering the club for protection.

Jefferson admitted that he was incarcerated at the time of trial, serving a sentence for assault. He further admitted on cross-examination that he had been convicted of aggravated burglary, unlawful possession of cocaine with intent to sell, and unlawful possession of marijuana with intent to sell. In addition, Jefferson testified that Marcus Jacocks had driven him to and from court on previous occasions, but he denied that they had discussed the Defendant's case. Jefferson also stated that the Defendant's family members had visited him in jail and asked him to testify. Finally, Jefferson testified that he was legally blind.

The Defendant testified on his own behalf at trial. He stated that he was fifteen years old at the time of the crime. He recalled that his mother had been placed in a mental institution prior to the crime, and he stated that he was living with various relatives during the time surrounding the crime. The Defendant testified that on the night of the crime, he, Marcus Jacocks, and two other males arrived at J.T.'s Lounge at approximately 11:30 p.m., and he and Jacocks performed on stage approximately an hour and a half after their arrival.

The Defendant testified that after the performance, he began to casually converse with a young woman who had complimented him on his performance. The Defendant testified that while he was talking to the woman, the victim, whom he did not know, approached him and asked, "What do you think you're doing, I'm sitting there?" The Defendant stated that he responded, "I didn't know you were sitting there, man." The Defendant testified that he soon got up, but he claimed that when he did, the victim passed him and bumped his leg. According to the Defendant, he asked the victim, "What's up man?" and the victim responded, "What's up with you, whore ass boy?" The Defendant stated that at this point, he and the victim began to argue. He recalled that the victim's friends eventually stepped between them, although he claimed that after they were separated, the victim was "still talking crazy and throwing mean threats." The Defendant maintained that the victim threatened to kill him, and he testified that he believed the victim was serious. He stated that Marcus Jacocks then advised him to leave and began to "pull[]" him out of the club.

The Defendant testified that after they exited the club, Jacocks would not let him back inside to find his friend, Brian Adams, so he waited outside the door. He stated that the victim, however, again approached him outside of the club with two of his friends. According the Defendant, the victim asked him, "What's . . . that shit you got to say to me?" He stated that he responded, "Go on, I don't want no trouble." The Defendant testified that the victim then said, "I told your mother-f__king ass; what's up now? I ain't no sucker." He testified that he interpreted this to be very confrontational and threatening, and he stated that he was frightened. The Defendant reported that the victim next said, "I'll kill you. I'll kill your mother-f__king ass" and reached towards his friend for a pistol, saying, "Give me a tone so I can kill this bitch." The Defendant testified that he saw the friend "raise[] his shirt up," and, believing that his life was in danger, the Defendant pulled his .38 caliber pistol and began to fire the gun. When asked what passed through his mind immediately before he began to fire, the Defendant responded, "Living. . . . Surviving."

The Defendant testified that he could not remember how many shots he fired. He stated that after he killed the victim, "the first thing that came to [his] mind was God forgive [him]." After shooting the victim, the Defendant looked for his cousin and saw him running across the street with another male to a car. The Defendant testified that he asked them for "a ride," but they refused to let him into the car, fearing that they would be named accomplices in the homicide. The Defendant testified that he therefore began running from the scene.

On cross-examination, the Defendant testified that he had obtained his gun about three months prior to the murder. He stated that he did not carry it everyday, but only "where [he] knew it [sic] would probably be hostility." He testified that he placed the loaded gun into a pocket in his briefs inside his pants prior to going to J.T.'s Lounge on the night of the crime. The Defendant testified that as he ran from the scene, the gun fell out of his pants pocket, where he had placed it after the shooting. The Defendant claimed that he "turned [himself] in" after the crime, but stated that he spoke to an attorney before making a statement to police. Finally, the Defendant admitted that he "passed words" with the victim during their argument prior to the shooting.

Dr. Allen Overton Battle, a clinical psychologist, testified that he first evaluated the Defendant in September 1991, when the Defendant was fifteen years old. He stated that his first evaluation of the Defendant, performed at the Juvenile Court detention center immediately after the crime, established that the Defendant had a mental age of eleven years old and an intelligence quotient (I.Q.) of 77, placing him in the borderline range of mental retardation. He testified that a person with the Defendant's I.Q. would be more "suggestible" and "inclined to accept whatever they are told just at face value and not question it." Dr. Battle stated that he reevaluated the Defendant in April 2000. He testified that his second evaluation revealed that the Defendant was within the normal range of intelligence, with a verbal I.Q. between 89 and 99, a performance I.Q. between 79 and 93, and a full scale I.Q. between 86 and 94. Dr. Battle stated that the discrepancy in the Defendant's two scores could be attributed to fatigue or emotional stress at the time of the first test. He also stated, "I found that [the Defendant] is an individual who one could say when emotion occurs in him, it's not so much that he has the emotion, but the emotion has him. . . . And that is one of his greatest weaknesses as far as his personality operation is concerned, and it would adversely affect his relationships with other people and ability to get along in general."

On cross-examination, Dr. Battle clarified his findings. He stated that the Defendant was not mentally ill and reported that the Defendant was no longer borderline mentally retarded. Dr. Battle also agreed that psychological stressors could greatly affect one's performance on an intelligence test. Finally, he stated that a person with motive to exaggerate his or her condition could deceive a test administrator.

## I. SUFFICIENCY OF THE EVIDENCE

The Defendant contests the sufficiency of the convicting evidence. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal

defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

The Defendant was convicted of second degree murder, which is defined as "[a] knowing killing of another . . . ." Tenn. Code. Ann. § 39-13-210(a)(1). In a second degree murder case, "'knowing' refers to a person who acts knowingly with respect to the result of the person's conduct (death to the victim) when the person is aware that the conduct is reasonably certain to cause the result." Id. § 39-11-302(b). Second degree murder is a "result of conduct" offense. See State v. Ducker, 27 S.W.3d 889, 896. (Tenn. 2000).

We conclude that sufficient evidence was presented to support the Defendant's conviction for second degree murder. Because the Defendant admitted that he shot the victim, the primary determination for the jury was the Defendant's state of mind at the time of the crime. Three witnesses to the crime testified that the shooter, identified by one of the witnesses as the Defendant, shot the victim several times in rapid succession from close proximity. One witness testified that during the shooting, the Defendant said to the victim, "I told you I was going to get you," while another witness testified that after the shooting, the Defendant said to the victim, "Look at you now." One of the witnesses testified that during the shooting, the Defendant was circling the victim as if to find certain spots from which to fire his gun. Another witness stated that he saw the victim attempt to cover his face for protection during the shooting. The medical examiner who reviewed the victim's autopsy report confirmed that the victim was shot from close proximity and died from multiple gunshot wounds. He also testified that defensive wounds were found on the victim's body. This is clearly sufficient evidence to support the jury's finding that the Defendant was aware that his conduct was reasonably certain to cause the victim's death. See id. Although the Defendant and defense witnesses testified that the victim confronted and threatened the Defendant prior to the shooting, the jury apparently did not believe that the Defendant acted in self-defense when he shot and killed the victim. We may not re-evaluate the jury's findings of fact. Matthews, 805 S.W.2d at 779. This issue is without merit.

## II. SENTENCING

The Defendant next contends that he was improperly sentenced. The trial court sentenced the Defendant as a Range I standard offender to twenty years incarceration. Because the Defendant was convicted of a Class A felony, see Tenn. Code Ann. § 39-13-210(b), the appropriate sentencing range in his case was between fifteen and twenty-five years. See id. § 40-35-112(a)(1).[1]

When a criminal defendant challenges the length, range, or manner of service of a sentence, the reviewing court must conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption, however, "is conditioned upon the affirmative showing in the record that the trial court

---

[1] The applicable statute regarding sentencing ranges has been in force since 1989. See Tenn. Code Ann. § 40-35-112.

considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In the event that the record fails to show such consideration, the review of the sentence is purely de novo. State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992).

In making its sentencing determination, the trial court, at the conclusion of the sentencing hearing, determines the range of sentence and then determines the specific sentence and the propriety of sentencing alternatives by considering (1) the evidence, if any, received at the trial and the sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered by the parties on the enhancement and mitigating factors, (6) any statements the defendant wishes to make in the defendant's behalf about sentencing, and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-210(a), (b), -103(5); State v. Williams, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995).

When imposing a sentence, the trial court must make specific findings of fact on the record supporting the sentence. Tenn. Code Ann. § 40-35-209(c). The record should also include any enhancement or mitigating factors applied by the trial court. Id. § 40-35-210(f). Thus, if the trial court wishes to enhance a sentence, the court must state its reasons on the record. The purpose of recording the court's reasoning is to guarantee the preparation of a proper record for appellate review. State v. Ervin, 939 S.W.2d 581, 584 (Tenn. Crim. App. 1996).

If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence "even if we would have preferred a different result." State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). The defendant bears the burden of showing the impropriety of the sentence imposed. Ashby, 823 S.W.2d at 169.

### A. PRESUMPTIVE SENTENCE

The Defendant first complains that the trial court sentenced him according to current sentencing guidelines, rather than those in effect at the time that his crime was committed. Specifically, he complains that the trial court began sentencing at the midpoint of the appropriate sentencing range. Although the current presumptive sentence for a felony is the midpoint of the range, see Tenn. Code Ann. § 40-35-210(c) (2001), the Defendant points out that his crime was committed prior to 1995, when the current sentencing guidelines went into effect. He thus argues that the trial court should have begun sentencing at the minimum sentence within the range.

To calculate the appropriate sentence for felony convictions committed before July 1, 1995, a trial court should begin the sentence at the minimum sentence within the range when no enhancement or mitigating factors are present. Id. § 40-35-210(c) (1989). If enhancement factors

but no mitigating factors are present, the trial court may set the sentence above the minimum, as long as the sentence is within the range. Id. § 40-35-210(d) (1989). However, if enhancement and mitigating factors are present, the trial court should start at the minimum sentence within the range; enhance the sentence within the range as appropriate for the enhancement factors; and then reduce the sentence within the range as appropriate for the mitigating factors. Id. § 40-35-210(e) (1989). The weight to be given a factor is within the trial court's discretion, provided that the trial court complies with the purposes and principles of the Sentencing Act and that its findings are adequately supported by the record. State v. Santiago, 914 S.W.2d 116, 125 (Tenn. Crim. App. 1995).

We agree that because the offense in this case was committed in 1991, the trial court erred by sentencing the Defendant using current sentencing guidelines. Our review of the Defendant's sentence is thus de novo with no presumption of correctness. See Shelton, 854 S.W.2d at 123. We conclude that one enhancement factor was improperly applied. In light of this and the fact that the trial court erred by applying the incorrect presumptive sentence, a reversal of the sentence and remand for a new sentencing hearing is appropriate.

## B. ENHANCEMENT FACTORS

The trial court applied the following three enhancement factors in sentencing the Defendant:
(5) The defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense;
. . .
(9) The defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense; [and]
(10) The defendant had no hesitation about committing a crime when the risk to human life was high . . . .

Id. § 40-35-114(5), (9), (10).[2] The Defendant concedes, and we agree, that enhancement factor (9) was properly applied in his case. See id. § 40-35-114(9). However, the Defendant contends that the trial court misapplied enhancement factors (5) and (10). See id. § 40-35-114(5), (10).

With regard to enhancement factor (5), the Defendant argues that no evidence was presented indicating that he treated the victim with exceptional cruelty during the commission of the offense. Id. § 40-35-114(5). Application of enhancement factor (5) requires "a finding of cruelty under the statute 'over and above' what is required to sustain a conviction for an offense." State v. Arnett, 49 S.W.3d 250, 258 (Tenn. 2001) (quoting State v. Embry, 915 S.W.2d 451, 456 (Tenn. Crim. App. 1995)). "[S]uch evidence must 'denote[] the infliction of pain or suffering inflicted for its own sake or from the gratification derived therefrom, and not merely pain or suffering inflicted as the means of accomplishing the crime charged.'" Id. (quoting State v. Kelly Haynes, No. W1999-01485-CCA-R3-CD, 2000 Tenn. Crim. App. LEXIS 241, at *9 (Tenn. Crim. App., Jackson, Mar. 14, 2000)). Application of this factor has been upheld based on extensive physical or psychological abuse or

---

[2] We note that although Tennessee Code Annotated § 40-35-114 has been amended since the time of the crime in this case, the subsections pertinent to our discussion have remained the same.

torture. Id. No such circumstances were present in this case. The evidence at trial indicates that the Defendant shot the victim multiple times in rapid succession. We note that one witness to the crime testified that the Defendant said, "I told you I was going to get you" to the victim during the shooting and that the Defendant walked around the victim during the shooting, as if to pick spots from which to shoot. However, we conclude that even if the jury accepted this evidence as true, this evidence does not constitute "exceptional cruelty" so as to warrant application of enhancement factor (5). Tenn. Code Ann. § 40-35-114(5).

The Defendant also contends that the trial court misapplied enhancement factor (10). See id. § 40-35-114(10). This Court has concluded that "[a]lthough factor (10) is inherent in every homicide case relative to the victim, the trial court may consider this factor when the defendant endangers the lives of people other than the victim." State v. Kelly, 34 S.W.3d 471, 480 (Tenn. Crim. App. 2000); see also State v. Hicks, 868 S.W.2d 729, 732 (Tenn. Crim. App. 1993). Testimony from trial indicates that several people were outside of J.T.'s Lounge at the time of the crime. Because of the proximity of other individuals to the place where the shooting occurred, we conclude that enhancement factor (10) was properly applied in this case. See Tenn. Code Ann. § 40-35-114(10).

## C. MITIGATING FACTORS

The trial court applied one mitigating factor in sentencing the Defendant: "The defendant, because of youth or old age, lacked substantial judgment in committing the offense . . . ." Id. § 40-35-113(6). The record supports application of this factor. However, the Defendant contends that the trial court should have applied two other mitigating factors as well, that he "acted under strong provocation," id. § 40-35-113(2), and that "[s]ubstantial grounds exist tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense . . . ." Id. § 40-35-113(3). His argument supporting each of these proposed mitigating factors is the same: that the victim confronted and threatened him prior to the shooting.

We conclude that the trial court properly declined to apply mitigating factors (2) and (3). See id. § 40-35-113(2), (3). The fact that the victim may have initiated the confrontation with the Defendant, may have verbally threatened the Defendant, and may have followed the Defendant outside of the club following their initial argument does not constitute "strong provocation," id. § 40-35-113(2), or excuse the Defendant's conduct. See id. § 40-35-113(3); see also See State v. Bryan Lamont Murray, No. M1998-00343-CCA-R3-CD, 1999 Tenn. Crim. App. LEXIS 1201, at *17-18 (Tenn. Crim. App., Nashville, Dec. 7, 1999). The Defendant escalated the conflict between him and the victim by drawing a gun and firing it at the victim. See State v. Baxter, 938 S.W.2d 697, 706 (Tenn. Crim. App. 1996). Furthermore, although some testimony was presented at trial that the victim reached for a gun immediately prior to the shooting, the jury apparently discredited this testimony when it rejected the Defendant's argument of self-defense. See State v. Maurice Garner, No. 02C01-9508-CR-00223, 1997 Tenn. Crim. App. LEXIS 426, at *21 (Tenn. Crim. App., Jackson, May 19, 1997). We find no other grounds to justify the Defendant's use of deadly force on the night of the crime.

### III. CONCLUSION

Because we conclude that sufficient evidence was presented to support the jury's verdict, we AFFIRM the Defendant's conviction. However, because the trial court erred in sentencing the Defendant, we REVERSE the sentence and REMAND the case to the trial court solely for the purpose of re-sentencing the Defendant in accordance with this opinion. The trial court shall sentence the Defendant based upon the principles set forth in this opinion, and without the presentation by the parties of additional evidence.

_____
ROBERT W. WEDEMEYER, JUDGE