IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 18, 2007

## STATE OF TENNESSEE v. SHANE DELANO HUNTER

**Appeal from the Criminal Court for Putnam County**
**No. 05-0668   Leon C. Burns, Jr., Judge**

---

**No. M2007-01026-CCA-R3-CD - Filed May 6, 2008**

---

In November 2005, a Putnam County grand jury indicted the defendant, Shane Delano Hunter, on one count of premeditated first degree murder in connection with an incident that occurred in August 2005. Following a January 2007 jury trial in Putnam County Criminal Court, the jury convicted the defendant of second degree murder. The trial court sentenced the defendant to a term of twenty years in the Department of Correction. On appeal, the defendant argues that the evidence produced at trial is insufficient to support his conviction and that the trial court imposed an excessive sentence. After reviewing the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**.

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ALAN E. GLENN, JJ., joined.

David N. Brady, District Public Defender; John Wayne Allen, Assistant District Public Defender, for the appellant, Shane Delano Hunter.

Robert E. Cooper, Jr., Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; Anthony J. Craighead, District Attorney General pro tempore, for the appellee, State of Tennessee.

## OPINION

At trial, Officer Randall Weiker with the Cookeville Police Department testified that on August 14, 2005, he received a call to perform a welfare check at an apartment in Cookeville. Upon arriving at the apartment building, he noticed blood on the stairs and handrail. When he arrived at the apartment door, he noticed blood on the door jamb and blood streaks on the walkway outside the door. Through the window, Officer Weiker could see that several holes had been punched in the walls. Officer Weiker then kicked in the door and entered the apartment. Once inside, he observed

several holes in the walls, a La-Z-Boy recliner that had been disassembled and overturned, a pair of blue jeans on the floor, and a blood stain, twelve inches in diameter, on the carpet. Officer Weiker then looked on the kitchen counter and saw three traffic citations with the defendant's name on them.

Officer Weiker then exited the apartment and followed a blood trail from the apartment into the apartment complex's gravel parking lot. He then observed a set of drag marks through the gravel. He followed the drag marks to a dumpster, where he found the body of the victim, later identified as Chad Patton.

Dr. Staci Turner testified that she supervised the victim's autopsy, which was conducted by Dr. Wayne Kurz. Dr. Turner testified that the victim died of blunt force head trauma, which led to skull fractures that depressed into the brain. Dr. Turner said that the injuries were caused by a single blow to the back of the head. Dr. Turner testified that the victim's death could have been instantaneous, though on cross-examination she said that it was more likely that the victim lived for a few seconds after getting hit. Dr. Turner testified that the victim had alcohol and marijuana in his system at the time of his death.

Justin Key testified that he first met the victim five years prior to trial, when Key was fifteen and a freshman in high school. He testified that he had known the defendant a month or two prior to the victim's death. Key testified that he and the defendant arrived at the defendant's apartment between 12:30 and 1:00 that morning, and that the victim and Thomas James met them there around the same time. Key said the four men spent some time drinking alcohol and smoking marijuana, and that initially there were no problems among the group, although "everybody" was intoxicated. Key testified that all four men took turns punching holes in the defendant's walls. Key noted that the victim asked the defendant if it would be okay for him to punch a hole in the wall, and the defendant replied that the victim could in fact punch a hole in the wall. Key testified that he did not observe the victim getting hit; Key testified that "I remember [the victim] getting up, and he hit the wall. And the next second, he was on the floor, and me and [James] looked at each other, because we were kind of stunned, we didn't know what had happened." Key testified that he then saw a "dark spot of red blood" form on the floor beneath the victim. At that point, James ran out the apartment, and Key followed.

Key testified that after he saw the victim on the floor, he and the defendant got into several arguments, and that he asked the defendant why he did what he did. According to Key, the defendant said something to the effect of "[h]e ain't going to be punching no holes in my wall," and that the defendant called the victim a "snitch," although Key did not know what the defendant meant by that term. After Key and James exited the defendant's apartment, the defendant went outside and approached the two men, asking each one for a ride. Key testified that both he and James told the defendant that they would not give him a ride. At that point, the defendant left. Key and James then attempted to reenter the apartment but found the door locked. Key and James then met a friend at a nearby Shell gasoline station, where Key called 911.

-2-

On cross-examination, Key admitted that all four men at the defendant's apartment that morning were drinking underage. Key said that the four men took turns drinking shots of Bacardi 151 rum, and that the defendant also drank at least one bottle of malt liquor and smoked marijuana. According to Key, he had never seen the defendant as drunk as he had been that morning. He observed the defendant vomit on the recliner, which led the defendant to disassemble it. Key testified that he observed the defendant jump off the apartment's second-floor balcony onto the ground below, and he also saw the defendant throw his cell phone off the balcony. According to Key, some other guests arrived at the defendant's apartment but later left for various reasons. One guest left because the defendant was getting on his nerves, and another guest threatened to hit the defendant.

Key testified that he saw two baseball bats in the apartment, including one that Key kept in his car after a friend had left it there. Key did not recall whether he saw the defendant with a bat in his hand that morning, and he also did not know who carried the two baseball bats into the apartment. Key also said that he did not call the police from the defendant's apartment because he was too intoxicated to do so.

Thomas James, who was twenty-one at the time of this trial, testified that he was at the defendant's apartment the morning the victim was killed. James said that he, the victim, and Key spent much of the morning drinking alcohol, and that all four men punched holes in the walls. James testified that eventually, he witnessed the defendant hit the victim in the back of the head with Key's baseball bat. James testified that the defendant said nothing before he hit the victim, and that there was no apparent animosity between the two men before the incident. However, James said that after the defendant hit the victim, the defendant angrily called the victim a "snitch" and a "narc" several times. James testified that he and Key left the apartment, and that the defendant followed them outside and asked them for a ride. James said that after both he and Key refused to give the defendant a ride, the defendant left. James and Key then went to a gas station, where Key called police.

On cross-examination, James said that although the defendant's behavior at the party was "[a] little bit" out of control, the defendant was not acting recklessly that night. James said that he saw the defendant drinking Bacardi 151 rum and what appeared to be a 40-ounce bottle of malt liquor at the party. James said that he kept a wooden baseball bat in his car for protection, but that he did not carry this bat into the apartment that morning. James testified that he did not call 911 at the apartment because he "wanted to get out" of the defendant's apartment after the victim was hit.

Austin Miller testified that at around 6:00 a.m. on the morning of August 14, 2005, he was sitting in his car outside a Cookeville Hardee's restaurant, where he worked, when the defendant approached him and asked him for a ride. According to Miller, the defendant's demeanor was calm, and Miller drove the defendant to a local BP gasoline station. During the ride, the defendant told Miller that he had killed the victim, hitting him in the back of the head with a baseball bat. Miller told the defendant that he did not believe him. Miller testified that the defendant said he killed the victim because the victim was a snitch, though Miller did not ask the defendant what he meant by

that term. After Miller dropped off the defendant, he returned to work. Miller did not contact the police because he did not believe that the defendant had actually killed anyone. On cross-examination, Miller said that he did not believe the defendant because the defendant had a tendency "to run his mouth and pop off."

Trevis Graham testified that sometime between 6:00 and 6:30 a.m. on August 14, 2005, he was stocking shelves at a Cookeville Wal-Mart when the defendant approached him. According to Graham, the defendant said that he had just killed a man and he needed help getting the body out of his apartment. Graham testified that he did not believe the defendant, whom he told to turn himself in to police. Graham said that the defendant explained that he hit the victim in the head with a baseball bat and that he did so because the victim "had 'snitch' written all over him." The defendant then left the store but returned between thirty and forty-five minutes later, informing Graham that his (the defendant's) apartment was "crawling with cops." Graham again told the defendant to turn himself in to police, at which point the defendant left the store, not to return.

According to Graham, the defendant was "pretty jittery" when he came to the store, and during the conversation the defendant appeared "real nervous," "panicky," and "out of it." On cross-examination, Graham said that later that morning, he told police that the defendant appeared to be "stoned out of his gourd" when he arrived at the Wal-Mart. Graham said he based his opinion on the fact that the defendant's eyes were bloodshot and on the unusual way he was acting at the store. Graham also said that the defendant was known to "run his mouth and pop off," and that he did not "know [the defendant] well enough to know whether or not what he says is what he does."

Detective Carl Sells with the Cookeville Police Department testified that when he arrived at the defendant's apartment the morning of the incident, other officers had already arrived. He entered the defendant's apartment and noted that it "was in a state of disarray." Furniture was overturned, objects were strewn about on the floor, several holes had been punched in the walls, and a blood spot was evident on the living room floor. Detective Sells also located a misdemeanor citation for simple possession of marijuana, dated July 25, 2005, and bearing the defendant's name. Detective Sells later went to the apartment complex's dumpster and observed the victim's body next to the dumpster.

Detective Sells testified that he eventually located the defendant at his father's residence in Monterey. Upon arriving at the residence between 12:00 and 12:30 p.m., the defendant's father gave the detective permission to enter the residence, and the detective located the defendant asleep in a bedroom. At that point, the defendant, who Detective Sells indicated did not appear to be intoxicated and who cooperated with the detective, was arrested. The detective then transported the defendant to the Cookeville police station, where he advised the defendant of his Miranda rights. The defendant waived those rights and gave a written statement. In the statement, the defendant indicated that he, the victim, and two other men were in the defendant's apartment when the victim punched a hole in the wall. The defendant asked the victim what he was doing, a question the defendant claims the victim did not answer. Instead, the victim merely "kind of smiled" at the defendant. The defendant then claimed that he hit the victim with a "metal wooden stick," and then

-4-

the victim "dropped." The defendant then tried to wake up the victim, who did not respond. The defendant indicated that he then changed clothes and left the apartment, receiving a ride "half way to Monterey" in a gold car before walking the rest of the way to his father's house.

Detective Sells testified that he also interviewed the defendant after he gave the written statement. During the interview, the defendant said that after receiving a ride to the BP gasoline station, he drove the victim's jeep toward Monterey, where the defendant's father lived. When the jeep ran out of gas, he abandoned it on Interstate 40 and walked the rest of the way to his father's house. According to the detective, the defendant also admitted that he told several people that the victim was a snitch "because of a situation he had been involved in a couple of weeks" prior to the victim's death, a situation which resulted in the issuance of the citation discovered in the defendant's apartment. The defendant also told the detective that he used the phrase "He had snitch written all over him" when referring to the victim. On cross-examination, Detective Sells testified that the defendant took full responsibility for the victim's death and was cooperative with police. The detective also said that the defendant "denied that [the victim's] death was caused because he was a snitch."

The defendant did not present any witnesses on his behalf. The jury acquitted the defendant of first degree murder but convicted him of second degree murder. At the sentencing hearing, the trial court imposed a sentence of twenty years in the Department of Correction. This appeal follows.

ANALYSIS

Sufficiency of Evidence

The defendant initially asserts that the evidence produced at trial was insufficient for the jury to convict him of second degree murder. We disagree.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979) (emphasis in original). The appellate court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, and on appeal the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict. Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

The defendant was convicted of second degree murder. Tennessee's criminal code defines second degree murder as "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1) (2006). A knowing act requires one to be "aware of the nature of the conduct" and "aware that the conduct is reasonably certain to cause the result." Id. § 39-11-302(b).

In this case, the evidence produced at trial, viewed in a light most favorable to the state, indicated that the defendant hit the victim in the back of the head with a baseball bat. The jury could have reasonably concluded that the defendant was aware that this conduct was reasonably certain to cause the victim's death, as is required by statute to sustain a second degree murder conviction. The defendant argues that he acted under provocation, but the jury rejected this argument. In our view, based on evidence that the defendant told several persons that the victim was a "snitch," the defendant's telling police that he was upset over what he perceived to be the victim's role in the defendant's receiving a citation for simple possession of marijuana, and the defendant's fleeing the scene of the incident, the jury's rejection of the provocation theory was well reasoned. Thus, we conclude that the evidence produced at trial was sufficient to support the defendant's conviction for second degree murder, and we deny the defendant relief on this issue.

Excessive Sentence

The defendant next argues that his twenty-year sentence in this case is excessive and contrary to law. The defendant's argument is two-fold. The defendant asserts that the trial court erred by failing to apply the mitigating factors proposed by the defendant, particularly one in which the defendant argued that he lacked substantial judgment in committing the offense based on his youth. The defendant also argues that the trial court's application of enhancement factors not found by a jury beyond a reasonable doubt violated his Sixth Amendment rights as interpreted by the United States Supreme Court in Cunningham v. California, 549 U.S. 270, 127 S. Ct. 856 (2007) and the Tennessee Supreme Court in State v. Gomez, 239 S.W.3d 733 (Tenn. 2007) ("Gomez II"). We conclude that both arguments are without merit and therefore affirm the sentence imposed by the trial court.

*Standard of Review*

An appellate court's review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d) (2006). As the Sentencing Commission Comments to this section note, on appeal the burden is on the defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, the court may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing

principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> [T]he trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence.

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994) (citation omitted); see Tenn. Code Ann. § 40-35-210(e) (2006).

The defendant committed his offenses in August 2005, so the 2005 revisions to Tennessee's sentencing act were applicable to the defendant's sentence. The revised sentencing act provides:

> (c) The court shall impose a sentence within the range of punishment, determined by whether the defendant is a mitigated, standard, persistent, career, or repeat violent offender. In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:
>> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
>> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210 (2006) (emphasis added). The weight to be afforded an enhancement or mitigating factor is left to the trial court's discretion so long as its use complies with the purposes and principles of the 1989 Sentencing Act and the court's findings are adequately supported by the record. Id. § (d)-(f); State v. Moss, 727 S.W.2d 229, 237 (Tenn. 1986); see Ashby, 823 S.W.2d at 169.

While the court can weigh sentence enhancement factors as it chooses, the court may only apply the factors if they are "appropriate for the offense" and "not themselves essential elements of the offense." Tenn. Code Ann. § 40-35-114 (2006). These limitations exclude enhancement factors "based on facts which are used to prove the offense" or "facts which establish the elements of the offense charged." Jones, 883 S.W.2d at 601. Our supreme court has stated that "[t]he purpose of the limitations is to avoid enhancing the length of sentences based on factors the Legislature took into consideration when establishing the range of punishment for the offense." State v. Poole, 945 S.W.2d 93, 98 (Tenn. 1997); Jones, 883 S.W.2d at 601.

In conducting its de novo review, the appellate court must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210 (2006); see Ashby, 823 S.W.2d at 168; Moss, 727 S.W.2d at 236-37.

*Sixth Amendment Concerns*

We will first address the defendant's assertion that the trial court's application of two enhancement factors to the defendant's sentence violated the defendant's Sixth Amendment rights. In his reply brief, the defendant states that "[a]t the time of the sentencing hearing, Tennessee's sentencing scheme was still governed by the Tennessee Supreme Court's decision in State v. Gomez, 163 S.W.3d 660 (2005)." This assertion, apparently based in part on the confusion of the parties at the sentencing hearing over which sentencing act would apply, is incorrect. The legislation enacting Tennessee's revised sentencing act states that the revised act "shall apply to sentencing for criminal offenses committed on or after the effective date of this act," June 7, 2005. See 2005 Tenn. Pub. Act ch. 353, § 18. The defendant committed his offense in August 2005; thus, the revised sentencing act applied. Regardless of any confusion that may have existed, our review of the record leads us to conclude that the trial court properly sentenced the defendant pursuant to the sentencing principles embodied in the new act.

The defendant correctly notes that our the Tennessee Supreme Court recently held that the trial court's enhancement of a defendant's sentence based on factors that had not been found by a jury beyond a reasonable doubt violated a defendant's Sixth Amendment right to a jury trial as interpreted by the Supreme Court. Gomez II, 239 S.W.3d at 740-41 (citing Cunningham, 127 S. Ct. at 860); see Blakely v. Washington, 542 U.S. 296, 301, 124 S. Ct. 2531, 2536 (2004). However, unlike Tennessee's former sentencing guidelines, Tennessee's revised sentencing act is an advisory system in which a trial court has great discretion in imposing an enhanced sentence. See Tenn. Code Ann. § 40-35-210(c) ("In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by" advisory sentencing guidelines). Tennessee's revised sentencing act was identified by the Supreme Court in Cunningham as a system in which "judges genuinely . . . 'exercise broad discretion . . . within a statutory range'" and therefore is one that "encounters no Sixth Amendment shoal." Cunningham, 127 S. Ct. at 871, 871 n.18 (citations omitted). Thus, the trial court's application of enhancement factors to the defendant's sentence did not violate his Sixth Amendment rights.

*Length of Sentence*

In this case, the trial court applied two enhancement factors to the defendant's sentence: the defendant's previous history of criminal convictions or criminal behavior, and his use of a deadly weapon during the commission of the offense. See Tenn. Code Ann. § 40-35-114(1), (9) (2006). The defendant proposed as mitigating factors his acting under strong provocation, his lack of substantial judgment in committing the offense based on his youth, and his impairment based on his

intoxication.  See Tenn. Code Ann. § 40-35-113(2)-(3), (6), (13) (2006).  The trial court refused to apply any of the proposed mitigating factors, and based on the two enhancement factors, it sentenced the defendant to twenty years in the Department of Correction.

Regarding the two enhancement factors, the record reflects that the defendant had a previous conviction for assault, which the defendant committed while being held in the Putnam County Jail awaiting trial in this case.  The presentence report also indicates that the defendant admitted to a history of underage drinking and using illegal drugs, including marijuana and painkillers such as Oxycontin, hydrocodone, and Xanax.  Although the defendant was never charged with any drug-related offenses, this court has previously held that a defendant's illegal drug use may be used to satisfy the "history of criminal behavior" enhancement factor.  See State v. Tony Levelle Ford, No. E2003-01725-CCA-R3-CD, 2004 WL 1237261, at *3 (Tenn. Crim. App. June 4, 2004) (citing State v. Carico, 968 S.W.2d 280, 288 (Tenn. 1998) and State v. Vanderford, 980 S.W.2d 390, 407 (Tenn. Crim. App. 1997)); State v. David Wayne Fountain, No. E2002-01066-CCA-R3-CD, 2003 WL 1916661, at *4 (Tenn. Crim. App. Apr. 22, 2003).  Thus, the trial court appropriately applied this enhancement factor to the defendant's sentence.  Furthermore, because use of a deadly weapon is not an element of second degree murder, the trial court also properly applied this enhancement factor to the defendant's sentence.  See State v. Baxter, 938 S.W.2d 697, 705-06 (Tenn. Crim. App. 1996).

Regarding the proposed mitigating factors, we note that Tennessee's revised sentencing act requires that the trial court consider any mitigating factors proposed by the defendant.  See Tenn. Code Ann. § 40-35-210(b)(5) (trial court shall consider "[e]vidence and information offered by the parties" regarding relevant mitigating and enhancement factors); id. § (e) (such consideration shall be placed on the record).  However, the trial court is not required to apply the mitigating factors.  See id. § (c)(2) (adjusting the sentence based on the presence of mitigating and enhancement factors is an "advisory sentencing guideline" which the court "shall consider, but is not bound by.").  The record in this case reflects that at the sentencing hearing, the trial court read through the list of statutory mitigating factors as established in Tennessee Code Annotated section 40-35-113 and explained why each factor did not apply.  Regarding the "lack of substantial judgment due to age" mitigating factor, the factor which on appeal the defendant argues the trial court should have applied, the trial court noted, "[C]ertainly being 19 years of age might have caused one to lack substantial judgment, but not to be excused for this conduct.  You can't say, 'Well, I'm 19, I can do what I want to, and I didn't know what was happening.'"  Given the discretion afforded the trial court under Tennessee's revised sentencing act, we conclude that the trial court acted properly in considering but refusing to apply the mitigating factors suggested by the defendant.

Finally, regarding the defendant's sentence, the trial court, finding the presence of two enhancement and no mitigating factors, sentenced the defendant to twenty years in the Department of Correction.  This sentence was within the range of fifteen to twenty-five years that the defendant could have received upon being convicted of a Class A felony as a Range I, standard offender.  See Tenn. Code Ann. § 40-35-112(a)(1) (2006).  Given this fact, coupled with the discretion afforded the trial court in weighing appropriate enhancement and mitigating factors, we conclude that the trial court acted properly in imposing the defendant's twenty-year sentence.  Thus, the defendant is not

entitled to relief on this issue.

CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE