IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs January 5, 2010

## STATE OF TENNESSEE v. MANUEL HAYNES

**Direct Appeal from the Criminal Court for Shelby County**
**No. 07-06993     James C. Beasley, Jr., Judge**

---

**No. W2009-00599-CCA-R3-CD  - Filed June 17, 2010**

---

A jury convicted the defendant, Manuel Haynes, of two counts of aggravated robbery, Class B felonies.  The trial court sentenced him as a Range II multiple offender to serve an effective sentence of thirty-five years in the Tennessee Department of Correction, twenty years for the first count consecutive to fifteen years for the second count.  On appeal, the defendant argues that (1) the evidence was insufficient to support his convictions; (2) the trial court erred in its application of enhancement factors when sentencing the defendant on the first count; (3) the trial court erred by imposing consecutive sentences; (4) the trial court erred by failing to re-read portions of the jury instructions; (5) the trial court erred by failing to grant a new trial based on the intoxication of a juror.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

Robert Wilson Jones, District Public Defender; and Barry W. Kuhn (on appeal) and Russell White (at trial), Assistant Public Defenders, Memphis, Tennessee, for the appellant, Manuel Haynes.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; William L. Gibbons, District Attorney General; and Anita Spinetta, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Background

*Trial*

On September 20, 2007, a Shelby County grand jury indicted the defendant, Manuel Haynes, on two counts of especially aggravated kidnapping, Class A felonies, two counts of aggravated robbery, Class B felonies, and one count of aggravated rape, a Class A felony. The jury found the defendant guilty of both counts of aggravated robbery and acquitted him of the remaining charges. The state presented the following evidence at the December 1 through December 4, 2008, trial, and the defendant did not present any proof.

Mary Jennifer Toole testified that she and her boyfriend, Corey Keith, were visiting his brother in Memphis, Tennessee, during May 2007. On the evening of May 26, she and Mr. Keith went to a strip club for thirty minutes to one hour, and then they went to a car show at an Auto Zone store. They were waiting for a drug dealer named Rico to call them back because they wished to purchase cocaine. Ms. Toole said that she began using cocaine in March 2007 when she started dating Mr. Keith. During their two-week stay in Memphis, they bought cocaine every other day and used cocaine most days. Prior to May 26, they had only bought drugs from Rico, but that night, he cancelled their arranged meeting. Because Mr. Keith insisted on purchasing drugs, they walked into the French Quarter apartment complex, where they had previously met Rico.

Ms. Toole testified that, in the apartment complex, they met a group of three to four men, including the defendant, and asked them about buying drugs. The men said that they could find some drugs for them, and the defendant and another man took Ms. Toole and Mr. Keith to an apartment. They went to a back room, and the defendant "pulled out a gun." Ms. Toole said the gun was a small, silver handgun. She testified that the defendant passed his gun to the second man, who held the gun for most of the time they were in the apartment. The defendant told them that he wanted all of their money and to empty their pockets. Ms. Toole only had her cell phone in her pockets, which she placed on the floor along with her jewelry. Mr. Keith, likewise, emptied his pockets and placed his cell phone and wallet on the floor. The defendant demanded money from Mr. Keith, and when Mr. Keith insisted that he had no more money, the defendant ordered him to remove his clothes. Ms. Toole testified that she stood quietly to the side and "was scared that [she] was going to have to take [her] clothes off or that [they] might get shot or killed[.]"

Ms. Toole testified that the defendant pointed the gun at her and made her take her clothes off. She complied. The defendant continued demanding money and told Mr. Keith that if he did not come up with money, then the defendant would rape Ms. Toole in front of him. When Mr. Keith did not have anything else to give him, the defendant "took his pants . . . down to his knees and . . . grabbed [Ms. Toole] by the back of [her] head and forced [her] to give him oral [sex]." The defendant penetrated her mouth with his penis. Then, he made

her lie on the floor on her back. He penetrated her vaginally before "pull[ing] out" and ejaculating into her mouth. Ms. Toole testified that the defendant was recording the assault on his cell phone "the best he could," while the other man held Mr. Keith at gunpoint. After the defendant ejaculated, Ms. Toole asked to go to the bathroom, and when he allowed her to go, she spit his semen into the toilet. She returned to the bedroom, and the defendant, who was holding the gun at that point, forced her and Mr. Keith to kneel in the corner of the room. The two men backed out of the room and instructed them to count backwards from one hundred. They counted down and then got dressed. She and Mr. Keith slowly left the apartment, and Mr. Keith took a shovel that was by the front door for protection. Ms. Toole said that they left the apartment at approximately 5:00 a.m. on May 27, 2007. They ran through the apartment complex to their car, but upon realizing that the men had taken their car keys, they went to a McDonald's restaurant. The restaurant was not open, and the employees inside would not allow them to use the phone. They proceeded to a Kroger grocery store, and the Kroger employees called the police for them. After the police arrived, they took her and Mr. Keith in separate cars to the apartment complex so that they could show the police the apartment. The police took her to a rape crisis center. At the center, Ms. Toole gave the personnel her clothing for evidence and submitted to a rape kit examination.

Ms. Toole admitted that she told the police that they were stopped on the side of the road to smoke a cigarette when two men robbed them and took them to the apartment complex. She said that she did not want to get in trouble and did not want anyone to know that she did drugs. Ms. Toole described the first suspect, who raped her, as dark-skinned, six feet tall, with "canine teeth." She was unable to identify him in a photo lineup or at the preliminary hearing. At the state's request, the court ordered the defendant to stand and display his teeth to Ms. Toole and to the jury. Ms. Toole testified that she recognized his teeth and identified the defendant as the man who raped her.

On cross-examination, Ms. Toole testified that she and Mr. Keith used crack cocaine before leaving his brother's house on May 26, 2007. Ms. Toole admitted that she lied under oath at the preliminary hearing when she testified that she and Mr. Keith had stopped on the side of the road to smoke a cigarette. She did not tell Mr. Keith that she planned to tell the truth at trial because they were no longer in a relationship and because he was incarcerated. She testified that she had intercourse with Mr. Keith the morning of May 26, 2007.

Corey Keith testified that he came to Memphis in May 2007 to visit his brother and to tile his brother's neighbor's kitchen. On May 26, he and his girlfriend went to a strip mall located in front of the French Quarter apartment complex to meet a drug dealer. Because they were unable to make contact with the dealer, they went into the apartment complex to buy drugs. Mr. Keith testified that "[o]ne guy lead [them] to another guy[,] and then [they] ended up in this apartment." He said that the two men in the apartment with him and Ms.

Toole were black males. Mr. Keith said that they smoked drugs in the apartment. One of the men left the room and returned carrying a pistol, which Mr. Keith described as either a .22 or .25 caliber stainless steel handgun with black grips. The man demanded Mr. Keith's money. Mr. Keith said that he "almost thought it was a joke . . . ." He told the man that he did not have any money. He realized that it was not a joke when the man took his clothes from him. Mr. Keith said that the man made him stand in a corner of the room, and "[he] knew something was getting ready to go wrong." The man threatened to beat him. Mr. Keith said that he realized he might get shot or beaten, but he was more concerned for Ms. Toole than for himself. Then, the man threatened to rape Ms. Toole, but Mr. Keith did not have any more money to give him. The man took off his clothes and proceeded to rape Ms. Toole by forcing his penis into her vagina and her mouth. Mr. Keith said that the man ejaculated into Ms. Toole's mouth and made her swallow. He testified that the second man had the pistol during the rape, but the first man took it from him and put it against the back of Ms. Toole's head. She began crying and told the man that she had a daughter. The man replied that he had a son. Then, the men turned off the lights and told them to count to one hundred. They counted down and then left the room. He grabbed a shovel by the door for protection. They went to a McDonald's restaurant, but the employees would not let them use the phone. They went to a Kroger grocery store next and used the phone there. Mr. Keith said that the men took his wallet, phone and brother's car keys.

Mr. Keith testified that he identified the defendant as the man who first pulled out a gun and later raped Ms. Toole from a photo lineup that the police showed him on May 27, 2007. He identified the defendant in the courtroom. Mr. Keith said that he remembered the defendant had "funny front teeth."

On cross-examination, Mr. Keith testified that he told the police that he and Ms. Toole had stopped to smoke a cigarette when two men rushed them with guns and forced them to go to the apartment complex, which was a lie.

Julie Atkeison, a nurse practitioner at the Memphis Sexual Assault Resource Center, testified that she examined Ms. Toole on May 27, 2007. She collected vaginal, vulva, and oral swabs and Ms. Toole's clothing. Ms. Toole reported that two black males took her to an apartment and told her to take her clothes off and lie in the floor. Ms. Toole reported that "she played with herself" and had oral and vaginal sex with one of the men. The man ejaculated into her mouth, and she spit the semen into a toilet. Nurse Atkeison testified that it is common not to find the presence of semen in a person's mouth if a period of time has passed, and the person spit out the semen and swallowed several times. Ms. Toole reported that she had consensual intercourse with her boyfriend within the twelve hours proceeding her examination. Nurse Atkeison testified that Ms. Toole had an external abrasion in her vaginal area.

On cross-examination, Nurse Atkeison described Ms. Toole's injury as "unusual" and "abnormal" because of its location. She agreed that the injury might have occurred during consensual sex.

Memphis Police Officer Adam Orr testified that the dispatcher informed him of a reported rape on May 27, 2007 at approximately 5:50 a.m., and he responded to the Kroger grocery store at 4270 Summer Avenue. When he arrived, the victims reported a rape and robbery. The victims took him to their car, which was parked in a strip mall in front of the French Village apartment complex.[1] Then, they showed him the apartment where the rape took place. Officer Orr observed damage to the lock on the apartment door. He testified that he entered the apartment, and the apartment appeared to match the description that the victims gave him. Officer Orr said that he interviewed the victims separately. He transported Ms. Toole to the Memphis Sexual Assault Resource Center and to the Sex Responder's Unit to give a statement to police.

Tennessee Bureau of Investigation ("TBI") Agent Donna Nelson, a forensic scientist, testified that she analyzed saliva standards taken from Ms. Toole, Mr. Keith, and the defendant. She also examined Ms. Toole's underwear, vaginal swabs, vaginal slide, and oral swabs. Agent Nelson confirmed the presence of spermatozoa on the vaginal swabs, vaginal slide, and underwear. She generated a partial DNA profile from the vaginal swabs and slide that was consistent with a mixture of DNA from Ms. Toole and Mr. Keith. The spermatozoa on the underwear was consistent with Mr. Keith. Agent Nelson did not find spermatozoa on the oral swabs. She testified that analysts may find spermatozoa in the mouth up to six hours after ejaculation, depending on the amount of oral activity, including spitting.

On cross-examination, Agent Nelson testified that she excluded the defendant as a donor of genetic material.

Memphis Police Detective Milton Gonzalez testified that he obtained the phone records for Ms. Toole and Mr. Keith's cell phones. He said that one phone was from AT&T, and the company cut off the service to that phone immediately after the robbery. The other phone was from Verizon, and the phone records showed an outgoing call at 6:08 a.m. to a cell phone number with a 901 area code that lasted one-hundred sixty-seven seconds. He obtained the subscriber information for the 901 number, which led him to Demetria Griffin. Detective Gonzalez and four other officers went to Ms. Griffin's address, arriving at 9:00 p.m. Detective Gonzalez said that the front door was open, but the storm door was closed. He knocked on the storm door, and the defendant came to the door. The defendant identified

---

[1] Ms. Toole and Mr. Keith referred to the apartment complex as French Quarter.

himself as Harold Taylor, locked the storm door, and asked what the officers wanted. When Detective Gonzalez told him that they wanted to speak with Ms. Griffin, the defendant said that they could not speak to her without a warrant. Detective Gonzalez said that the defendant became upset. The detective saw several children and Ms. Griffin inside the home, but Ms. Griffin would not make eye contact with him or respond in any way. He said that she and the children appeared frightened. Eventually, the defendant closed the front door and the window shades. Detective Gonzalez observed that the defendant had a large gap in his teeth, which matched part of the victim's description of the suspect. The detective learned the actual identity of the defendant, and other officers used a picture of the defendant in a photo lineup that they showed to the victims. One of the victims identified the defendant's photograph.

Detective Gonzalez testified that he heard the defendant tell Ms. Griffin to get her story straight and say that he had not been at the apartment for two days. At 12:30 a.m., the defendant allowed Ms. Griffin and the children to leave the apartment. The defendant also came outside, and the police placed him in custody. Ms. Griffin gave Detective Gonzalez her cell phone, and the detective found the victim's phone number in the phone's call records.

*Sentencing*

The trial court held a sentencing hearing on January 9, 2009. The court admitted the defendant's pre-sentence report into evidence. It sentenced the defendant as a Range II multiple offender based on the defendant's two prior convictions for aggravated robbery. The court found that the following enhancement factors applied to both counts: (1) the defendant had a history of criminal convictions in addition to those necessary to establish the appropriate range; and (2) the defendant was the leader in the commission of offenses involving two or more persons. Additionally, the court found, as to the aggravated robbery against Ms. Toole, that the defendant treated the victim with exceptional cruelty. The court stated that it placed the greatest weight on the defendant's lengthy criminal record and found that no mitigating factors applied. The court sentenced the defendant to twenty years for the aggravated robbery of Ms. Toole and fifteen years for the aggravated robbery of Mr. Keith. The court ordered the sentences to run consecutively based on its finding that the defendant was a dangerous offender.

**Analysis**

The defendant presents five issues for our review: (1) whether the evidence was insufficient to support his convictions; (2) whether the trial court erred in its application of enhancement factors when sentencing the defendant on the first count; (3) whether the trial court erred by imposing consecutive sentences; (4) whether the trial court erred by failing to

re-read portions of the jury instructions; and (5) whether the trial court erred by failing to grant a new trial based on the intoxication of a juror.

### I. Sufficiency of the Evidence

For his first issue, the defendant argues that the evidence supporting his aggravated robbery convictions was insufficient because the state failed to prove that Mr. Keith was put in fear. The state responds that the evidence was sufficient because Ms. Toole testified that she was afraid, and Mr. Keith testified that he was afraid for Ms. Toole. We agree with the state.

Our review begins with the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558; *Tuggle*, 639 S.W.2d at 914. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002); *Bland*, 958 S.W.2d at 659. Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *See State v. Elkins*, 102 S.W.3d 581, 582 (Tenn. 2003); *Reid*, 91 S.W.3d at 277.

To sustain the defendant's convictions for aggravated robbery, the state was required to prove that the defendant committed an intentional or knowing theft of property from the person of another using violence or fear and that the theft was accomplished with a deadly weapon or an article used to lead a victim to reasonably believe it to be a deadly weapon. *See* Tenn. Code Ann. §§ 39-13-401(a), -402(a).

Viewed in the light most favorable to the state, the state's evidence showed that the defendant drew a pistol on the victims and demanded that they give him all of their money. The defendant ordered them both to strip and rifled through their clothing while his partner

held the pistol. Mr. Keith testified that the defendant took his wallet. Ms. Toole testified that she "was scared . . . that [they] might get shot or killed[.]" Mr. Keith said that the defendant threatened to beat him, and he also said that he "was more afraid [for Ms. Toole] than [he] was [for himself]." The jury accredited the testimony of the victims that they were afraid. We conclude that a rational jury could have found beyond a reasonable doubt that the defendant committed aggravated robbery.

## II. Sentencing

The defendant contends that the trial court erred by applying the enhancement factor that the defendant treated Ms. Toole with exceptional cruelty and in imposing consecutive sentencing. Specifically, the defendant argues that the trial court's finding that the defendant treated Ms. Toole with exceptional cruelty was inappropriate because Ms. Toole admitted that she originally lied to police, thus tarnishing her credibility. Additionally, the defendant argues that, in imposing consecutive sentences, the trial court improperly relied on the defendant's use of a deadly weapon when finding that the defendant was a dangerous offender because the use of a deadly weapon was an element of the offense. The state responds that the record supports the trial court's application of the enhancement factors and that there is no prohibition against using an element of the offense when determining the appropriateness of consecutive sentencing. We agree with the state.

### A. Standard of Review

An appellate court's review of a challenged sentence is *de novo* on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). The Sentencing Commission Comments to this section of the statute indicate that the defendant bears the burden of establishing that the sentence is improper. When the trial court follows the statutory sentencing procedure and gives due consideration to the factors and principles relevant to sentencing, this court may not disturb the sentence. *See State v. Carter*, 254 S.W.3d 335, 344-45 (Tenn. 2008).

Aggravated robbery is a Class B felony. Tenn. Code Ann. § 39-43-402(b). As a Range II multiple offender, the defendant was eligible for a sentence of twelve to twenty years for each count. *Id.* § 40-35-112(b)(2). The defendant does not contest the length of his sentence for the aggravated robbery of Mr. Keith nor the enhancement factors that applied to both aggravated robbery sentences, namely that the defendant had a history of criminal convictions in addition to those necessary to establish the appropriate range and that the defendant was the leader in the commission of offenses involving two or more persons. Accordingly, we do not review those issues.

### B. Enhancement Factors (Defendant's Issue 2)

Prior to the 2005 amendments to the 1989 Sentencing Act, in sentencing a defendant, a court was to begin at the mid-point of the statutory range and then apply the appropriate enhancement and mitigating factors. Pursuant to the 2005 amendments, our Sentencing Act has abandoned the statutory minimum sentence and renders enhancement and mitigating factors advisory only. *See* Tenn. Code Ann. §§ 40-35-114, -35-210(c). The 2005 amendments set forth certain "advisory sentencing guidelines" which the trial court is required to consider but is not bound by. *See* Tenn. Code Ann. § 40-35-210(c). Although the application of factors is advisory, a court shall consider "[e]vidence and information offered by the parties on the mitigating and enhancement factors in §§ 40-35-113 and 40-35-114." *Id.* § 40-35-210(b)(5). The trial court is also required to place on the record "what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, to ensure fair and consistent sentencing." *Id.* § 40-35-210(d). The trial court must find facts related to sentencing by a preponderance of the evidence rather than beyond a reasonable doubt. *State v. Winfield*, 23 S.W.3d 279, 283 (Tenn. 2000). Additionally, the trial court may consider facts that "are the basis of a charge for which there has been an acquittal." *Id.*

In this case, the trial court found that the defendant treated the victim, Ms. Toole, with exceptional cruelty based on her testimony that the defendant raped her. The defendant challenges the application of this enhancement factor, arguing that the victim's testimony was not credible because she admitted that she lied to the police and at the preliminary hearing. The trial court found Ms. Toole's testimony to be credible. Questions of credibility are reserved to the fact-finder and will not be reviewed by this court. *Bland*, 958 S.W.2d at 659. Based on the trial court's finding of Ms. Toole's credibility, we conclude that the trial court's determination that the exceptional cruelty enhancement factor applied to this sentence is supported by the record. The record shows that the trial court followed the statutory procedures and considered the sentencing factors and principles; therefore, we will not disturb the defendant's sentence. *Carter*, 254 S.W.3d at 344-45. The defendant's argument is without merit.

### C. Consecutive Sentencing (Defendant's Issue 3)

Generally, it is within the discretion of the trial court to impose consecutive sentences if it finds by a preponderance of the evidence that at least one of following statutory criteria apply:

> (1) [t]he defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;
>
> (2) [t]he defendant is an offender whose record of criminal activity is extensive;

(3) [t]he defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) [t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) [t]he defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) [t]he defendant is sentenced for an offense committed while on probation; or

(7) [t]he defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b).

If the court concludes the defendant is a dangerous offender under Tennessee Code Annotated section 40-35-115(b)(4), it must make two further determinations in addition to applying general sentencing principles. *State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002). First, it must find an extended sentence is necessary to protect the public from further criminal conduct by the defendant, and, second, it must find consecutive sentencing to be reasonably related to the severity of the offenses. *State v. Wilkerson*, 905 S.W.2d 933, 939 (Tenn. 1995).

In this case, the trial court found that the defendant was a dangerous offender under Tennessee Code Annotated section 40-35-115(b)(4) because of his use of a deadly weapon and his history of robbing and assaulting people. The court further found that the defendant's extended confinement was necessary to protect the public because of the "defendant's unwillingness to lead a productive life," his "anti[-]societal lifestyle," and his prior criminal

activity. The court found that a sentence of thirty-five years reasonably related to the seriousness of the offenses and the defendant's background.

The defendant contends that the trial court cannot justify its finding that the defendant was a dangerous offender based on his use of a deadly weapon because the use of a deadly weapon was an element of aggravated robbery. Tennessee Code Annotated section 40-35-114 prohibits courts from finding enhancement factors that are elements of the offense, but section 40-35-115, governing consecutive sentencing, does not contain a similar prohibition regarding the imposition of consecutive sentences. Our supreme court has allowed consecutive sentencing based on conduct that constituted an element of the offense. *See State v. Lane*, 3 S.W.3d 456, 460 (Tenn. 1999). The supreme court noted that section 40-35-114's prohibition did not apply to consecutive sentencing. *Id.* at 460 n. 4. Therefore, we conclude that the trial court did not err when it considered the defendant's use of a deadly weapon in finding that the defendant was a dangerous offender. We further conclude that the trial court did not abuse its discretion in imposing consecutive sentences. The defendant is, therefore, without relief for this issue.

### III. Failure to Re-Read Jury Instructions

The defendant contends that the trial court erred when it did not re-read portions of the jury instructions after the jury submitted a note to the court stating that they were deadlocked. The state responds that the trial court did not err because neither the jury nor the defendant requested that the trial court re-read the jury instructions in response to the note. We agree with the state.

As a mixed question of law and fact, our standard of review for questions concerning the propriety of jury instructions is *de novo* with no presumption of correctness. *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001). Under *Kersey v. State*, when the jury advises the trial court that it is deadlocked, the trial court may give supplemental instructions if it "feels that further deliberations might be productive." 525 S.W.2d 139, at 141 (Tenn. 1975). In order to avoid intruding on the province of the jury by "coercing the minority to yield to the majority," when instructing the jury to continue deliberations, the trial court should not "direct any of its comments to jurors in the minority" or "urge such jurors to reevaluate or to cede his or her views to those of the majority." *State v. Baxter*, 938 S.W.2d 697, 704 (Tenn. Crim. App. 1996). *Kersey* advises trial courts that they *may* re-read the portion of the jury charge that explains that the verdict should be unanimous while warning the jurors against "surrender[ing] [their] honest conviction . . . because of the opinion of [their] fellow jurors." *Kersey*, 525 S.W.2d at 145. However, the court is not required to repeat the *Kersey*

charge.  *See id.*  Additionally, when a court chooses to repeat instructions or give supplemental instructions, the instructions must be:

> (1) appropriately indicated by questions or statements from jurors, or from the circumstances surrounding the deliberative and decisional process, (2) comprehensively fair to all parties, and (3) not unduly emphatic upon certain portions of the law to the exclusion of other parts equally applicable to the area of jury misunderstanding or confusion.

*Berry v. Conover*, 673 S.W.2d 541, 545 (Tenn. Ct. App. 1984).


The record in this case indicates that the jury retired for deliberations at 11:00 a.m. on December 4, 2008.  That same day, the jury sent the trial court a note at 3:16 p.m. reading, "We are unable to unanimously decide."  The court responded, "Please keep working."  The defendant argues that the court should have re-read portions of the jury charge, but he fails to articulate which portions he would have had the court re-read.[2]  Neither the defendant nor the jury requested that the trial court re-read any part of the charge, and the jury did not ask the court to clarify a question.  The defendant further argues that the court's reply prejudiced him, stating that "there was an indication from two of the jurors that they thought that they had to reach a unanimous verdict or they might never be allowed to leave the court."  This argument is apparently based on information that the defendant's trial counsel received from jurors after the jury returned its verdicts and which trial counsel presented to the court in the defendant's motion for new trial.  However, "statements made by counsel during a hearing or the trial are not evidence." *State v. Draper*, 800 S.W.2d 489, 493 (Tenn. Crim. App. 1990).  While the court might have repeated the *Kersey* instructions, the court was not required to do so. *Kersey*, 525 S.W.2d at 145.  The court's instruction to the jury to continue deliberations was not coercive. *Baxter*, 938 S.W.2d at 704.  Furthermore, by not repeating any part of the instructions, the court avoided emphasizing portions of the law. *Berry*, 673 S.W.2d at 545.  Therefore, we conclude that the court's instruction was appropriate, and the defendant's argument is without merit.


### IV. Juror's Intoxication

For his final issue, the defendant argues that the trial court erred by failing to grant a new trial based on a juror's intoxication.  The state responds that the record does not support the defendant's allegation that a juror was intoxicated, and he was, therefore, not entitled to a new trial.  We agree with the state.

---

[2]  At the motion for new trial hearing, trial counsel argued that the court should have re-read the portion of the jury charge concerning how the jury was to deliberate.  However, on appeal, the defendant has not reiterated trial counsel's specific assertion.

In the defendant's motion for new trial, he argued that the court should grant his motion because his right to a fair trial was infringed due to juror misconduct. Specifically, the defendant alleged that three jurors committed misconduct by not reporting that they smelled alcohol on the breath of another juror and that one juror committed misconduct by participating in the trial and deliberations while intoxicated. On appeal, the defendant argues that Tennessee Code Annotated section 22-2-312, allowing an ill juror to be discharged, and *State v. Millbrooks*, 819 S.W.2d 441 (Tenn. Crim. App. 1991), holding that intoxication constitutes an illness subjecting the juror to discharge, support his proposition that the court should have granted his motion for new trial. In *Millbrooks*, the trial judge noticed the juror's intoxication and questioned the juror about it, subsequently dismissing the juror. 819 S.W.2d at 444-45. Here, there is no proof in the record that any juror was intoxicated during the trial. The defendant relies on the argument made by his counsel at the motion for new trial hearing, which does not constitute evidence. *Draper*, 800 S.W.2d at 493. We conclude that the record does not support the defendant's allegation, and he is not entitled to relief on this issue.[3]

**Conclusion**

Based on the foregoing reasons, we affirm the judgments of the trial court.

_____

J.C. McLIN, JUDGE

---

[3] We note that the trial court ruled that a juror's testimony regarding another juror's alleged intoxication would be an inquiry into the validity of the verdict, which is prohibited by Tennessee Rule of Evidence 606(b). The defendant has not challenged the trial court's ruling on appeal.